## GENERAL COURT, MAY TERM, 1799.

### WARD *vs.* MORRIS & NICHOLSON.

ATTACHMENT on *warrant* under the act of November 1795, *ch.* 56, removed to this court from Prince-George's county court, by a writ of *certiorari.* Under this attach‑ ment, squares and lots lying within the city of Washing‑ ton, in the District of Columbia, were attached by the sheriff of Prince-George's county.

The following *admission of facts* were submitted for the court's opinion thereon, viz.

That the plaintiff in this case is and was a citizen of this state at the time when the debt accrued on the cause of action on which the attachment in this case issued. That the defendants in this case, are respectively non‑ residents of this state, to wit, resident of the state of

*Pennsylvania,* and that they were traders to this state; and being so nonresident and traders, they having a fee simple estate in the lands on which the attachment is laid, by deed of bargain and sale, duly executed, acknowledged and recorded, before the issuing of the warrant for attachment, and before the laying of the attachment, to wit, on the 26th of June 1797, for a valuable consideration paid, conveyed the said lands in fee to a certain *Henry Pratt,* and others. That the grantees in the said deed were and yet continue citizens and resident of the state of *Pennsylvania,* and not of this state. That the said *Henry Pratt,* and others, or any other person, have never executed such bond as is required by the act of 1753, *ch.* 36, entitled, " A supplementary act to the act, entitled, An act for the relief of creditors in England against bankrupts who have imported any goods into this province not accounted for." *(a)*

The question was, whether or not the said deed was valid and operative to pass the fee to the grantees therein named?

*Cranch, Mason* and *Shaaff,* for the plaintiff.

*Martin,* (Attorney-General,) and *Key,* for the defendants.

*(a)* Act of 1753, *ch.* 36—" That no assignment, assurance, conveyance, deed, or any other writing whatsoever, of any goods, chattels, effects, debts, lands, tenements or hereditaments, whatsoever, that shall at any time hereafter be made or executed by any person or persons trading, or that shall hereafter trade, to this province, and that shall reside in Great-Britain, or elsewhere, out of this province, at the time of making or executing such assignment, assurance, conveyance, deed, or other writing whatsoever, shall be of any force, virtue or effect, at law or in equity, until the person or persons to whom such assignment, assurance, conveyance, deed, or other writing whatsoever, shall be made or executed, or his or their agent or agents, at or near or attornies in fact, or such other person or persons who shall act by commission or direction from him or them, shall give his or their bond or obligation, with such security therein as shall be approved of and determined by the chancellor of this province for the time being, to pay and satisfy all and every the debt and debts which such person or persons, making or executing such assignment," &c. "shall or may owe at the time of entering into such bond or obligation as aforesaid, to all and every person or persons living or residing, or that shall live or reside, within this province, so far forth as the goods," &c. " shall come to the hands or possession of such agent," &c.

*Section* 2. " That such bond or obligation to be entered into for the purpose aforesaid, shall be lodged with the register of the court of chancery of this province for the time being, to be by him kept and preserved among the records and proceedings of the said court; and that every creditor living and residing within this province, of such person or persons making or executing such assignment," &c. " as aforesaid, if he shall think fit, shall or may make application to the chancellor," &c. " for the assignment of such bond or obligation to be entered into as aforesaid, and shall or may put the same bond or obligation in suit against such person or persons to whom such assignment, assurance," &c. " shall be made or executed, and his or their sureties if need be, in any court of record within this pro-

MAY 1799.

Ward
vs.
Morris and
Nicholson.

*Key* for the defendants, contended, that this case did not come within the meaning, policy or spirit, of the act of 1753. If that act stood alone, doubts might be entertained; but being supplementary to the act of 1704. *ch.* 29. it was necessary to consider that law also; all laws made upon the same subject matter must be considered together—4 *Bac. Ab. tit. Statute,* 647. He would first take a view of the act of 1704, *ch.* 29, entitled, "An act for the relief of creditors in England, against bankrupts who have imported any goods into this province, not accounted for." *(a)* This law was made soon after the extension of trade from England to this country. It was found necessary that the property of a bankrupt should be liable to the debts due by him in England, subject to the proviso in the act; because a commission of bankruptcy in England transferred no property of the bankrupt which might be in this country. What was the situation of the people of Maryland under the act of 1704,

vince, for any neglect or refusal to pay or satisfy unto such creditor such sum or sums of money or tobacco as shall or may be due unto him from such person or persons who shall make or execute such assignment," &c. " at the time when such bond or obligation shall be entered into as aforesaid; provided always, that no such bond or obligation to be given as aforesaid, shall be good and pleadable or admitted in evidence against any person or persons, after the debt or thing in action shall be above three years standing; saving to all persons that shall be under the impediments of infancy, coverture, insanity of mind, imprisonment or beyond sea, the full benefit of all such bonds or obligations for the space of three years after such impediment removed."

*Section* 3. This act to continue for three years, &c.—It was further continued by 1757, *ch* 8, and 1760, *ch.* 3, for three years, &c. But by 1763, *ch.* 6, is made perpetual.

*(a)* Act of 1704, *ch.* 29—"That if any person who is become bankrupt in England, and hath imported into this province any cargo of goods and merchandises, and the same consigned to any his factor or agent in this province, who hath not accounted, or shall not have accounted for such cargo to his principal; that is to say, to the bankrupt aforesaid, before an action of account be brought against such factor or agent, by the commissioner of bankrupt, or before a legal demand made, to have account of such cargo to the said commissioner, by the agent, factor, or attorney of such commissioner; that the commissioners of bankrupts, by virtue of this act, may compel such factor or agent to account to them, as he should have done to the principal; and the commissioners of bankrupt shall be adjudged, deemed and taken, to have the same right to such goods and cargo, and the produce of the same, as they have to any the goods and wares of the said bankrupt in England."

*Section* 2. " Provided always, That no such commission shall be put in use, or executed, before such factor of such commissioners of bankrupt put in good security to satisfy the debts contracted in this province by such bankrupt merchant, his factor or factors, under the credit of such cargo or cargoes of goods imported, which are hereby supposed to be all such debts as shall be contracted by such bankrupt merchant, his factor or factors, after importation of such cargo or cargoes."

unless the commissioners of the bankrupt in England executed a bond? They could demand no account, and the bankrupt might come into this country, receive his debts, and leave the creditors here without any remedy. The act of 1704 gave no priority or lien to our citizens, but in the event of an execution of the bond. In the year 1753, the legislature found that the act of 1704 would not meet all the existing evils; it was to secure domestic creditors which was the cause of the passing of the law of that year. Under the act of 1704 only goods and chattels were affected, and domestic creditors had no priority where the bankrupt had land. The supplementary act in 1753, affected land. The absurd and pernicious consequences which would follow from a contrary construction are innumerable; it would defeat trade. If a man purchased of a foreigner, trading to this state, a cargo of goods, and paid therefor a full and valuable consideration, the sale would be void unless he gave bond. If an Englishman mortgaged property to secure the payment of a debt, the mortgage would be void. If a planter sold his tobacco to a British factor, who assigned bonds in payment, such assignments would be void, unless another bond was given by the purchaser. Even a piece of broad cloth, bought of a foreigner, could be attached, unless the purchaser give bond, to be liable for the amount to creditors. If land is bought of a foreigner, and a bond of conveyance is given by him, the purchaser must give bond to be answerable, and under the last clause of the act he must sue himself. Such are the monstrous evils which would flow from this construction.

He noticed the 2d *section of the 4th* article of the *constitution* of the *United States*, which he said entitled the defendants, and every citizen of a sister state, to the privileges of our own citizens; and to show that our legislature have considered them on a footing with ourselves, he referred to the act of 1791, *ch.* 45, *sec.* 6, which enables foreigners to hold lands in that part of the District of Columbia which lies within this state, in the same manner as if they were citizens of this state.

*Shaaff, Mason and Cranch,* for the plaintiff, contended, that where the intention of the legislature is plain no other power can controul it. 1 *Blk. Com.* 91.—There is no evil growing out of the law which may not be remedied by the ordinary rules of construction. 1 *Blk. Com.* 87, lays down the principle by which a statute ought to be construed. We must consider what the law was before the act of 1704; the mischief complained of, and the remedy intended to be given—when a man, who held

MAY 1799.

Ward
vs.
Morris and
Nicholson.

property in Maryland, was declared a bankrupt in England, he was left in the enjoyment of his property here; the mischief was, that honest creditors here were defrauded. The act of 1704 was the remedy applied to this mischief. In 1704 our exports were less than our imports. Few subjects of these colonies had claims against subjects of Great Britain; but many British subjects had demands against American subjects. British merchants had acquired a considerable property here. The law of 1704 constitutes this property a fund for the discharge of debts against him in case of his bankruptcy. A provision in favour of Maryland creditors was then unnecessary. Between the years 1704 and 1753, the commerce of these colonies assumed a more flourishing aspect; our exports were considerable, and many of our subjects became creditors of British subjects, and the act of 1753 was made for the benefit of such Maryland creditors. This law does not transfer any thing; it merely strikes at certain conveyances. How then can it be said to enlarge the operation of the act of 1704? The act of 1753 is calculated only for the benefit of Maryland creditors. Bankrupts would be more apt to give the preference to British subjects, with whom they were acquainted, than to strangers. Men, much involved in debt, might by fraudulent conveyances withdraw the only fund out of which the Maryland creditors could with ease be satisfied. The word "bankrupt" is properly introduced into the act of 1704, because that act was only intended for the benefit of British creditors. But the law of 1753, being for the benefit of Maryland creditors, it was necessary to introduce a more general term, (trader.) The law of 1753 strikes only at certain conveyances; British merchants may send factors over here, who may purchase negroes, or any other property, (except land,) and transfer it without the sale being affected by this act. The act of 1704 is a perpetual law; that of 1753 a temporary one. If the latter was intended only to enlarge the operation of the former, it ought to have been made permanent. It is introductory of new provisions, the wholesomeness of which was to be determined by time. Experience proving it to be a good law, it was in 1763 made permanent. The law of 1704 was made with a different intent from that of 1753; as to the title of the act, that is no part of it, nor can be taken as a clue to the exposition of it—4 Bac. Ab. 465. The words of the act of 1753 are very different from those in the act of 1704; the latter applies only to creditors in England; under the act of 1704 a factor might sell goods in the course of trade, but not otherwise. Had the legislature intended to confine the law of 1753 to bankrupts,

why not insert that word, as had been done in the form-
er law? Why substitute in its place the more general
term, trader? In determining this question no regard
ought to be had to the consequences, nor to the practice
unless sanctioned by law. With respect to the idea sug-
gested by the counsel for the defendants, and predicated
upon the 2d *section* of the 4th *article* of the constitution
of the United States; the law of 1753 gives no pre-
ference to our own citizens; a person residing out of Ma-
ryland is subject to certain restrictions; citizens of this,
as well as other states, purchasing land out of Maryland,
must give bond, otherwise the conveyance will be void.

CHASE, Ch. J. observed, (in reply to something said
at the bar,) that it had been decided in the general
court, that the attachment first delivered to the sheriff
had the preference, and if the sheriff laid the attachment
last received, first, it was at his own risk—*Wallace, John-
son & Muir, vs. Forrest & Stoddert.* (a)

*Martin,* (Attorney-General,) in reply. In the expo-
sition of laws you must sometimes deviate from the words
to obtain the spirit; and all laws upon the same subject
must be considered in connexion with each other. The
statutes of bankruptcy do not extend beyond England,
and could not vest goods in Maryland in the assignees,
without an act of assembly. There is no privity between
the assignees and the bankrupt; they take under the ap-
pointment of the creditors, and not by transfer from the
bankrupt. But the bankrupt might have transferred
the property in this country to the assignee; and the law
was to prevent Maryland creditors from being deprived
of their debts. For under a commission of bankruptcy
in England no foreigner can come in for a dividend. This
proves the propriety of the proviso in the act of 1704,
as the commissioners under that act would have swept
off all the property for British creditors. About the
year 1753 British merchants had acquired in these colo-
nies other property besides goods, and debts due there-
for; and the act of 1704 affected only them. It was the
practice of the bankrupt to make an actual assignment
of the property he had in the colonies. The property in
Great Britain was transferred to the commissioners by
operation of law; but actual conveyances were necessary
to vest in them such property as the bankrupt had in the
colonies. Those assignments were made in order that
the dividend might be greater, and the allowance to the
bankrupt larger. Conveyances and assurances, mention-

(a) 2 Harr. & M'Hen. 261.

ed in the act, meant such as were given by bankrupts to their assignees. Assignment being the only method by which the assignees could obtain an interest in the bankrupt's property in this province, the law declares such assignments void unless bond be given to satisfy debts due from bankrupts to citizens of Maryland, to the amount of the property conveyed to them. The title of a law, it has been said, is no part of a law. Although this be true, yet the title is so far a part of the law as to let us know whether it be a supplement to any other law, and must be considered in connexion therewith. The word *England* is used in the law of 1704, because the union of England and Scotland had not then taken place, and we had no commerce with the latter. They were united shortly after, before the year 1753. According to the construction given to the law by the gentlemen on the other side, all purchases from foreigners would be insecure; but if their idea be correct, a contract for a valuable consideration could never be invalidated, although the purchase money was never applied as by the law intended. It could never have been designed, that the purchaser should be insecure to render the Maryland creditor secure. The assignees paid nothing for the property which was assigned to them for the use of the British creditors; they are forbid to touch such property, unless they previously give bond; such condition can operate no injury to them as they pay nothing; and if they chuse to take it, it must be charged to the full extent of its value, with the debts due to Maryland creditors. Commerce cannot be carried on to any extent without the creditors taking instruments of writing. If credit be given, bonds, notes, bills of exchange, &c. are required. To this it is replied, that bonds could not be assigned in England, nor until many years after, (1763,) in Maryland. But let it be remembered, that notes and bills of exchange might—nay bonds might be assigned and the assignee be enabled to recover the money.

To the remark that the laws were not connected because the one was a perpetual and the other temporary, it may be answered, that the law of 1753 was made temporary because its utility was to be determined by experiment. It was practised under and was found beneficial. In short, the evils resulting from such a construction, as the gentlemen contend for on the part of the plaintiff, are so many and monstrous, so variant from the general interpretation, and the uniform practice under it, that he trusted it would never receive the sanction of the court.

CHASE, Ch. J. delivered the following opinion: *(a)* The court, after full consideration of this case, are of opinion, that the acts of parliament relating to bankrupts did not extend to the province of Maryland, and did not operate on the property of the bankrupt which he held here. The act of 1704, *ch.* 29, relates expressly to bankrupts in England *importing goods and merchandise* into the province of Maryland. The legislature had two objects in view,

1st. The securing the property of the bankrupt here, being goods and merchandise, for the benefit of his creditors.

2d. To secure a preference in the payment of the debts contracted here by the bankrupt under the credit of such goods imported.

By the operation of this act of assembly all the right to the goods of the bankrupt, not accounted for by the factor to his principal, previous to a demand made by the agent, factor, or attorney of the commissioner of the bankrupt, was vested in the commissioner; provided security was given by the factor of the commissioner to satisfy debts contracted here by the bankrupt. When the act of 1704 passed, the commerce or trade of the province was very inconsiderable, and consisted chiefly of the importation of goods from England, and exportation of tobacco from hence. The act of 1753, *ch.* 36, is a supplement to the act of 1704. These acts must be considered together as forming one system, and such an exposition given as will effectuate the general intention of the legislature, and to answer the ends of public benefit which they had in view. In the interval between the two acts, the trade of the province had much increased; the merchants in England trading here had acquired property in lands, negroes, and every species of personal estate. The act of 1753 embraced more objects than the principal; it comprehended every kind of property, real and personal; it extended to all traders, those in England, or residing elsewhere, trading to this province. It contemplates traders becoming bankrupts wherever they might live out of the province, and pursues the great object under the act of 1704, the securing a preference or priority of payment of the debts due to creditors resident in the province, contracted on the faith of the property of the trader, and to the extent of the property which shall come to the hands or possession of such agent, attorney, or person acting by commission or direction as aforesaid. According to the laws of England, when a commission of bankruptcy is taken out, all the property of the bankrupt in England is vested in

*(a) Done, J. concurring.*

the commissioners from the time the first act of bankruptcy was committed, and all transfers and dispositions of property made by the bankrupt in the intermediate time are avoided.—1 *Burr.* 31. As the acts of bankruptcy did not operate on the property of the bankrupt here, if the commissioner did not proceed under the act of assembly of 1704 to subject the property here to the commission, the bankrupt retained the power of disposition over it, and the creditors had a right to proceed against the bankrupt, and attach his property here, and then each creditor secured his debt according to the diligence used for the recovery of it. According to the act of 1753 when a trader to this province became a bankrupt, and was declared so according to the laws of the country where he lived, the power of disposition of his property here was restrained, and he could not make a valid transfer of it to the commissioner, or his agent, factor or attorney, unless bond was given in the manner that act directs; and if such bond was not given, the whole of the property of the bankrupt here, of every kind and denomination, would remain as a fund for the payment of the debts of the creditors of the bankrupt, and attachable wherever it could be found in Maryland.

This appears to the court to be the sound construction of the two acts of assembly, considering them together as forming one system, and relating to traders living out of this state, and trading here. By this exposition, which is warranted by the acts themselves, justice will be done to the creditors who contracted debts with the bankrupt on the credit of the property he held here, and the numerous evils and inconveniencies avoided which would result from, and grow out of, the construction contended for, considering the act of 1753 as an independent law, and having no relation to the act of 1704. It may well be conjectured, that an evil experienced between the acts of 1704 and 1753, by the creditors of Maryland, gave rise to the act of 1753. As the acts relating to bankrupts did not operate to vest the property of the bankrupt, which he held in this province, in the commissioners, the bankrupt retaining the power of disposition over the property might have transferred it to the commissioners, and thereby have given a preference to his creditors in England, in total exclusion of his creditors here, whereby that property, which was considered as the proper fund for paying the creditors here, would be broke in upon, and diverted from its proper use, to the injury of the creditors here. The act of 1753, made to restrain this unjust and pernicious practice of the bankrupt, by declaring all assurances and transfers made in writing by the bankrupt, of his property here,

ineffectual, unless bond with security was given in the manner prescribed by the act, operates in the same manner on the property here, as the bankrupt laws of England affected the property there, in defeating all conveyances and transfers made by the bankrupt after he was so declared. By this construction of the act, that evil is redressed, and the property here is liable to be attached by the creditors residing in this state. It is certainly contrary to the principles of commerce, and repugnant to justice, that the assembly should interfere to restrain the free transfer of property by a trader previous to his becoming a bankrupt; such regulation instead of promoting would annihilate trade. The act of 1704 points at the evil to be remedied, and provides for the security of the creditors who trusted the bankrupt's property here. It was impracticable for the creditors living in this province, from the remoteness of their situation, to come in for a dividend of the bankrupt's property in England; and hence the necessity of appropriating by law the property here, as a fund out of which the creditors residing in this province were to be satisfied if the commissioner availed himself of the acts of 1704 and 1753—2 *Burr.* 829. 1 *Ba. Ab,* 258. The act of 1753 being a supplement to the act of 1704, and pursuing the same object, was more effectual in its operation for the attainment of it. The act of 1753 avoids all assurances and transfers of the property, in this province, of the trader, after he becomes a bankrupt; it restrains the commissioner from proceeding under the commission to affect the property here, until he gives bond with security, to be answerable to the creditors residing within this province, to the full extent of the property here belonging to the bankrupt. If the commissioner did not elect to proceed under the act, and give the security required, the creditors residing in the province would generally acquire a preference, because, being on the spot, they could first lay attachments on the property here. The attachment laws passed in 1692, *c.* 62, recorded in Lib. *L. L. fol.* 172, Liber *W. H. & L. fol.* 103, and Liber *L. L. No.* 2. *fol.* 17; and in 1704, *c.* 14, recorded in Lib. *L. L. No.* 3, *fol.* 1—These acts were similar to the act of 1715, *c.* 40. The words, ("or elsewhere,") in the act of 1753, were thrown in rather to provide for a possible than a probable case; for in 1753 the trade with the province of Maryland was almost confined to merchants in England and Scotland, who did business through the medium of their factors here. If the act of 1753 is considered as an independent law, the consequence would be, that every assurance and transfer in writing, by a trader living out of the province, of

any part of his property, real or personal, would be void, unless the purchaser gave bond and security to be answerable to the amount of the property so transferred to him, which would effectually prevent all transfers in writing, from the trader, of any part of his property, to any person whatever, as no person would become a purchaser, if to validate the writing, the evidence of his title to the property bought, he is to give bond, with security, to be answerable to the amount of such property. I am satisfied the two acts ought to be considered together as making one system of law on the same subject, and as providing for the case of a trader living out of the province who becomes a bankrupt. The words "agent or agents, attorney or attornies in fact, or such other person or persons, who shall act by commission or direction," &c. used in the middle of the first section of the act of 1753, and repeated in the conclusion of the same section, with the words "goods," &c. "which shall come to their hands or possession," coupled with the act of 1704, indicate plainly that the assembly had nothing in contemplation but the case of a trader becoming bankrupt; and this exposition is confirmed by the evils and inconveniencies resulting from a contrary construction, and no instance having occurred in which the unlimited operation contended for has been given to the act of 1753.

In the case of *William Campbell* against *Robert Morris,* *(a)* on the clause in the constitution of the general government, that the citizens of one state should enjoy all the immunities and privileges of the citizens of any other state, the court determined, that a particular and limited operation was to be given to those words; that it did not mean the right of suffrage, the right of holding offices in the state, nor the right of being elected, but the meaning of those words was, that the citizens of all the states should have and enjoy the peculiar advantage of acquiring and holding real as well as personal property, and that the same should be protected and secured by the laws of the state in the same manner as the property of the citizens of the state is protected. That it should not be liable to any taxes or burthens which the property of the citizens is not subject to; and to be on the same footing in the payment of the debts of a deceased debtor, with creditors living in the state. If the act of 1753 is to be viewed as an independent law, without reference to the act of 1704, and a deed is good to a creditor or person residing within the state, all creditors or persons residing in any of the other states, as to the means of acquiring and holding real and personal property, are to be considered on the

*(a)* 3 Harris & M'Henry, 535.

same footing, and as enjoying the same immunities and privileges. By the act of 1791, *ch.* 45, *s.* 6, a foreigner is made capable of taking and holding lands within that part of the territory of Columbia, lying within this state, by deed or will, and of conveying or transmitting the same to his heirs, in the same manner as if he was a citizen of this state. This act has no influence on the question before the court. A foreigner means a person who is not a citizen of any of the United States. The privilege or capacity of taking, holding, conveying, and transmitting lands, lying within any of the United States, is by the general government conferred on, and secured to all the citizens of any of the United States, in the same manner as a citizen of the state where the land lies could take, hold, convey, and transmit the same.

THE COURT are of opinion, that the deed from *Morris, Nicholson, Fox and Greenleaf,* to *Henry Pratt,* and others, is valid and operative to pass the lands therein mentioned to the said *Henry Pratt,* and others, notwithstanding the said objections.

DUVALL, J. He gave a different construction to the act. The act of 1704 is a perpetual law, and is very clear. That of 1753 is a supplement to the act of 1704, and no doubt they must be construed together. The act of 1753 operates upon every species of property. It was a temporary law at first, but afterwards made perpetual. It was intended to secure Maryland creditors, and embraces all *traders.* Its object was to restrain all traders from conveying their property, unless bond was given by the purchaser. Unless the law of 1753 included other descriptions of persons than that of 1704, why were not the words of the latter act used in the former? Why was *"bankrupt"* dropped to introduce *"trader?"* Why was the one made temporary when the other was perpetual? If they are considered separately, or together, they must be thus construed. No argument could be drawn from the construction which others have given to it, as it has never undergone a judicial determination. The act of 1791 is foreign to the dispute. The constitutional question is the only point on which he has doubts; though it has not been relied on. It removes the restraint imposed by the act of 1753.

ATTACHMENT quashed with costs.

The plaintiff appealed to the Court of Appeals, but the appeal was not prosecuted.