42 P.3d 394 (2002)
145 Wash.2d 702
GRANT COUNTY FIRE PROTECTION DISTRICT NO. 5, a municipal corporation; Wyatt D. Hanks and Annette Hanks, husband and wife, Appellants,
v.
CITY OF MOSES LAKE, a municipal corporation, Respondent.
Busby International, Inc., a Washington corporation; D & L Foundry and Supply, Inc., a Washington corporation; Hanson Processing LLC, a Washington limited liability company; EKA Chemicals, Inc., a Delaware corporation; Pacific Northwest Sugar, L.P., a Washington limited partnership; Inland Terminals, Inc., a Washington corporation, Agri Beef Co., an Idaho corporation, Defendants.
Yakima County Fire Protection District No. 12, a municipal corporation; Lyle E. Gapen and Max Seal, Appellants,
v.
City of Yakima, a municipal corporation, Respondent.
Nos. 70090-7, 70499-6.
Supreme Court of Washington, En Banc.
Argued March 20, 2001.
Decided March 14, 2002.
*396 Snure Law Offices, Clark Snure, Brian Snure, Des Moines, Christine Gregoire, Attorney General, Narda Pierce, Solicitor General, Olympia, for Appellants.
Elizabeth Thomas, Seattle, Raymond Paolella, Lawrence Peterson, Yakima, Peter Di-Julio, Seattle, Roger D. Wynne, Asst. Seattle City Attorney, Seattle, Michael Wyman, James Whitaker, Ephrata, for Respondents.
Greg A. Rubstello, Joseph Z. Lell, Seattle, Daniel B. Heid, Auburn City Attorney, *397 Auburn, Amicus Curiae on Behalf of Washington Association of Municipal Attorneys.
Christine Gregoire, Attorney General, William Collins, Asst., Olympia, Amicus Curiae on Behalf of Attorney General.
*395 BRIDGE, J.
In these consolidated cases, affected property owners and fire districts seek review of summary judgment orders denying their challenge to the constitutionality of the "property-owner-petition" method (petition method) of annexation. We hold that the petition method of annexation gives an impermissible privilege to owners of highly valued land, and therefore violates article I, section 12 of the Washington State Constitution.

FACTS
In each case, the city used the petition method to annex property. The primary distinction between the cases is the statute involved. Moses Lake is a "code city" that chose to be incorporated under chapter 35A RCW, whereas Yakima is a "non-code city" operating under chapter 35.13 RCW.

The City of Moses Lake Annexation
The Wheeler Corridor area is adjacent to the city of Moses Lake and at all relevant times was within the city's urban growth area (UGA) or interim UGA. Between 1990 and 1998, seven corporate property owners signed Extraterritorial Utility Extension Agreements (EUEAs). These agreements entitled them to receive water and sewer services from Moses Lake in exchange for granting power of attorney to the city manager to sign any future annexation petition on their behalf. The corporations waived the right to object to any future annexation. Pursuant to the agreements, Grant County Fire District No. 5 (GCFD5) provided residents of the area with fire protection and emergency medical services.
Since Moses Lake is a code city, the procedure for the petition method of annexation is governed by chapter 35A.14 RCW and requires two steps. Prior to circulating a petition, the owners of at least 10 percent of the assessed value of the property in the proposed area for annexation must sign a notice of intent to petition. If the city council accepts the notice, owners of at least 60 percent of the assessed value must sign a petition before the annexation may proceed.
On May 11, 1999, the city manager, acting as attorney in fact for at least 10 percent of the Wheeler Corridor property owners, filed a notice of intent to petition the city council for annexation pursuant to chapter 35A. 14 RCW. On May 25, the city council accepted the notice. On June 8, the city council directed the city manager, as attorney in fact for 60 percent of the Wheeler Corridor property owners, to sign an annexation petition. In essence, Moses Lake petitioned itself to annex the property.
On August 10, 1999, the city council held a public hearing at which property owner Paul Carpenter presented a petition opposing annexation on behalf of the owners of 80 parcels, with a value of approximately $20,000,000. Gus Smith, who owned seven other parcels, also stated his opposition. Nevertheless, the city council approved the petition. Thereafter, on September 28, the city council sua sponte authorized the city manager to amend the petition and revise the legal boundaries.
Following another public hearing on October 26, 1999 the city council approved the amended petition. On November 9, 1999, Moses Lake adopted the annexation ordinance. On April 21, 2000, Moses Lake published the ordinance, and five days later it began to provide law enforcement and fire protection services to the Wheeler Corridor area. From that point, GCFD5 no longer provided services to the area.
On September 27, 1999, Wyatt and Annette Hanks, property owners and registered *398 voters in the Wheeler Corridor area, together with GCFD5, filed an application for writ of review and complaint for declaratory judgment contesting the validity of the annexation proceedings and challenging the constitutionality of the petition method of annexation. The trial court granted summary judgment in favor of Moses Lake, ruling that none of the plaintiffs had standing to challenge the validity of or to restrain the use of the utility agreements, and finding the petition method of annexation to be constitutional. Plaintiffs filed a motion for reconsideration, which was denied. Plaintiffs timely appealed to Division Three of the Court of Appeals, which transferred the appeal to this court.

City of Yakima Annexation
The facts in the Yakima annexation closely parallel those in Grant County. In 1981, Yakima County (County), the city of Yakima (Yakima), and the town of Union Gap adopted the Yakima Urban Area Comprehensive Plan (YUAP), stating that "[residents and land owners within the Yakima Urban Area are best served by the City of Yakima or the town of Union Gap rather than the County and shall be encouraged to annex."[1] Several property owners in the Nob Hill/S. 40th Avenue area signed Outside Utility Agreements (OUAs) allowing them to receive garbage and refuse service in exchange for consent to future annexation of the property just as though the owner had signed an annexation petition.
The procedure for the petition method of annexation for this non-code city is governed by chapter 35.13 RCW, which parallels the procedure for code cities, but with some differences. The initial notice of intent to petition may be signed either by the owners of at least 10 percent of the assessed value of the proposed annexation area or by at least 10 percent of the property owners. The property owners must also file a notice of intent to annex with the Washington State Boundary Review Board (BRB), which then reviews and approves, disapproves, or modifies the proposed annexation. If the city council accepts the notice of intent to annex, owners of at least 75 percent of the assessed value must sign a petition conforming to the requirements of the BRB before annexation may proceed.
On June 15, 1999, Yakima initiated annexation proceedings based on the OUAs signed by the owners of 198 of the 269 properties in the described area. Yakima's expressed reasons for annexation included consistency with the goals of the YUAP and the Growth Management Act, chapter 36.70A RCW. On March 9, 2000, the BRB held a public hearing to review the proposed annexation. Yakima County Fire District No. 12 (YCFD12) and property owner Lyle E. Gapen spoke in opposition.
On April 12, 2000, the BRB met to review the proposed annexation and found that the annexation would remove 2.2 percent of the tax base of the fire district and approximately 1.8 percent of its area. At the request of the County, the board modified the proposed annexation to include an additional area, to avoid having an "island" of unincorporated territory within Yakima. In a written statement, YCFD12 opposed the addition of the island on the grounds that the expanded area to be annexed did not contain OUAs covering 75 percent of the assessed value. State Representative John Koster for the 39th District requested an opinion from the attorney general. The opinion upheld the procedure. On August 15, 2000, Yakima adopted ordinance 2000-32, annexing the area as modified by the BRB, with an effective date of September 18, 2000.
On August 22, 2000, YCFD12 and property owners Lyle E. Gapen and Max Seal filed suit seeking a declaration that RCW 35.13.125-.160 is unconstitutional, voiding the annexation, and enjoining Yakima's future use of OUAs as a basis for annexation petition signatures. YCFD12 claimed a loss of tax revenues, tax basis, and associated debt capacity pursuant to RCW 52.08.021.[2] *399 Gapen and Seal own property within the annexation area, but neither of them owns property subject to OUAs. They claimed that the petition method denied them their right to vote.
On September 19, 2000, Yakima adopted ordinance 2000-44, which repealed ordinance 2000-32 and changed the effective date of the annexation to December 6, 2000, to allow time for the litigation. On November 7, 2000, the trial court granted summary judgment in favor of Yakima. In contrast to the holding in Grant County, the court held that all plaintiffs have standing, but, as in Grant County, held that the petition method of annexation was constitutional. The plaintiffs filed a timely notice of appeal.

ANALYSIS
The threshold question in each case is whether these plaintiffs have standing. The trial court in Grant County held that none of the plaintiffs had standing; the Yakima County court held that all plaintiffs had standing.
Standing to seek a declaratory judgment is addressed by statute, the Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW:
A person ... whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.
RCW 7.24.020. To establish harm under the UDJA, a plaintiff must present a justiciable controversy premised on allegations of harm personal to him/her that are substantial and not conjectural or speculative. Walker v. Munro, 713124 Wash.2d 402, 411, 879 P.2d 920 (1994). The common law doctrine of standing clarifies the statutory right, prohibiting a litigant from raising another's rights. Id. at 419, 879 P.2d 920.
This court has established a two-part test to determine standing under the UDJA. The first part of the test asks whether the interest the complainant seeks to protect is "`arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" Save a Valuable Env't v. City of Bothell, 89 Wash.2d 862, 866, 576 P.2d 401 (1978) (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 152-53, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). The second part of the test considers whether the challenged action has caused "`injury in fact'" to the complainant. Id.
The focus of the "zone of interest" test is whether the statute was designed to protect the interests of the plaintiff. In evaluating standing to challenge a previous version of chapter 35.13 RCW, this court held that "[i]t is undisputed that the residents of the area proposed for annexation would have standing to raise the equal protection claim." City of Seattle v. State, 103 Wash.2d 663, 669, 694 P.2d 641 (1985). This court has held that residents operating a business and owning property within an area to be annexed have a clear interest in the proceedings and have standing. State ex rel. Thigpen v. City of Kent, 64 Wash.2d 823, 825, 394 P.2d 686 (1964). See also Seattle, 103 Wash.2d at 669, 694 P.2d 641 (holding that both residents and municipalities acting on behalf of their residents have standing to raise constitutional issues).
The "injury in fact" test focuses on whether a plaintiff has suffered an actual injury. It is axiomatic that parties whose financial interests are affected by an action have suffered injury. Seattle Sch. Dist. No. 1 v. State, 90 Wash.2d 476, 493, 585 P.2d 71 (1978) (holding that a school district has standing when legislation involves "actual financial restraints"); see also Am. States Ins. Co. v. Breesnee, 49 Wash.App. 642, 645-46, 745 P.2d 518 (1987) (holding that injured party's uninsured motorist carrier had standing in declaratory judgment action between *400 responsible party and his liability insurer).
In each of these cases, the property owners satisfy the "zone of interest" test because the petition method was adopted as an alternative form of annexation specifically to protect the interest of property owners. See RCW 35.13.130, RCW 35A.14.120. Likewise, the property owners satisfy the requirements of actual injury for the "injury in fact" test because they face higher tax rates following annexation.
A more difficult issue is the standing of the fire districts. Moses Lake and Yakima (respondents) argue that the interests of the fire districts are not within the zone of interest protected by the statute, because they own no property in the annexation area and because they have no right to vote. GCFD5 and YCFD12 (appellants) respond that residents of the annexation areas do not have a vote in the annexation decision and that their interests in fire protection and emergency medical services are represented here by the fire districts. This court has held that municipalities acting on behalf of their residents have standing to raise constitutional issues. Seattle, 103 Wash.2d at 669, 694 P.2d 641. Thus, the fire districts have standing to act on behalf of the residents of the affected areas.
Respondents also argue that the fire districts suffered no injury in fact because any loss of revenue will be offset by a reduction in service area. Appellants respond that although removal of 2.2 percent of YCFD12's tax base and a similar removal from GCFD5's tax base is not in itself a large impact, it is a certain impact involving actual financial restraints. They argue that although the service area is correspondingly reduced, overhead expenses will remain constant.
In Yakima County Fire Protection District No. 12 v. City of Yakima, 122 Wash.2d 371, 379-80, 858 P.2d 245 (1993), the fire district challenged the constitutionality of OUAs prior to annexation. This court held that the fire district lacked standing because its financial interests were not directly affected by the OUAs and would not be affected at all unless the annexation proved successful. Id. In contrast, the financial impact now at issue, while small, is certain. The fire districts have suffered actual injury.
When a controversy is of substantial public importance, immediately affects significant segments of the population, and has a direct bearing on commerce, finance, labor, industry or agriculture generally, this court has been willing to take a "less rigid and more liberal" approach to standing. Wash. Natural Gas Co. v. PUD No. 1, 77 Wash.2d 94, 96, 459 P.2d 633 (1969). Here, we accepted direct review of this case precisely because it is of substantial public importance. The form of government under which an area falls necessarily affects commerce and finance.
We therefore hold that all parties have standing, and turn now to an analysis of the substantive issues presented.

Statutory Scheme
As noted above, the petition method of annexation is governed by two parallel sets of statutes, containing substantially the same provisions. The choice of statutory scheme depends on whether the city is a "code" or "non-code" city. In the case of non-code cities such as Yakima, the relevant statute reads as follows:
A petition for annexation of an area contiguous to a city or town may be made in writing addressed to and filed with the legislative body of the municipality to which annexation is desired.... [T]he petition must be signed by the owners of not less than seventy-five percent in value according to the assessed valuation for general taxation of the property for which annexation is petitioned: ... The petition shall set forth a description of the property according to government legal subdivisions or legal plats which is in compliance with RCW 35.02.170, and shall be accompanied by a plat which outlines the boundaries of the property sought to be annexed.
RCW 35.13.130. Ultimate control of the decision to annex following a petition remains with the municipality, which "shall determine by ordinance whether annexation shall be made." RCW 35.13.150 (emphasis added).
Code cities such as Moses Lake are governed by a different statute, chapter *401 35A.14 RCW, which also provides for annexation either by election or by petition and describes the procedures necessary to commence a petition:
Prior to the circulation of a petition for annexation, the initiating party or parties, who shall be the owners of not less than ten percent in value ... of the property for which annexation is sought, shall notify the legislative body of the code city in writing of their intention to commence annexation proceedings. The legislative body shall set a date, not later than sixty days after the filing of the request, for a meeting with the initiating parties to determine whether the code city will accept, reject, or geographically modify the proposed annexation.... Approval by the legislative body shall be a condition precedent to circulation of the petition. There shall be no appeal from the decision of the legislative body. A petition for annexation of an area contiguous to a code city may be filed with the legislative body of the municipality to which annexation is desired. It must be signed by the owners ... of not less than sixty percent in value, according to the assessed valuation for general taxation of the property for which annexation is petitioned: ... Such petition shall set forth a description of the property according to government legal subdivisions or legal plats and shall be accompanied by a map which outlines the boundaries of the property sought to be annexed.
RCW 35A.14.120. As with chapter 35.13 RCW, the city retains ultimate authority for the decision to annex after receiving a petition. "Following the hearing, if the legislative body determines to effect the annexation, they shall do so by ordinance." RCW 35A.14.140 (emphasis added).
Under both chapter 35.13 RCW and chapter 35A.14 RCW, the petition method is an alternative to an election method, whereby a majority of residents vote to annex a particular property to a city. In the case of non-code cities, the Legislature has specifically provided that the election method "shall be an alternative method, not superseding any other." RCW 35.13.170. Similarly, for code cities, RCW 35A.14.110 provides that the election method "is an alternative method and is additional to the other methods provided for in this chapter." Appellants challenge these schemes, claiming that each is unconstitutional under article I, sections 12 and 19 of the Washington State Constitution and the equal protection clause, amendment 14, section 1 of the United States Constitution.

Article I, Section 19 of the Washington State Constitution
Respondents claim that absent an express grant of the right to vote on a given annexation proposal, no constitutional right to vote on such a proposal exists. Appellants, on the other hand, argue that because the Legislature granted residents a generalized right to vote on annexation proposals, any alternative mechanism impermissibly infringes on the right to vote.
Article I, section 19 provides that "[a]ll Elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." We have interpreted this provision separately from the equal protection clause of the federal constitution and have stated that it "provides additional protection for voting rights." Seattle, 103 Wash.2d at 672-73, 694 P.2d 641. However, this "provision does not require that `voters may go to the polls at any time and vote on any question they see fit,'" but that "otherwise qualified voters who are significantly affected by the results of an election be given an opportunity to vote in that election." Seattle, 103 Wash.2d at 673, 694 P.2d 641 (quoting State v. Wilson, 137 Wash. 125, 132, 241 P. 970 (1925)).
This court has held that a statute allowing property owners to prevent an annexation election by filing a petition burdened the right to vote and was thus unconstitutional under article I, section 19. Id. at 672-73, 694 P.2d 641. The statute at issue in that case read as follows:
At any time before the date is set for an annexation election under RCW 35.13.060 or 35.13.174, all further proceedings to annex shall be terminated upon the filing of *402 verified declarations of termination signed by:
(1) Owners of real property consisting of at least sixty percent of the assessed valuation in the area proposed to be annexed; or
(2) Sixty percent of the owners of real property in the area proposed to be annexed.
RCW 35.13.165. The Seattle court concluded that because the statute allowed property owners to directly interfere with a vote on annexation, it was unconstitutional. As the court noted:
When the State has chosen to submit such an issue to a vote, the election must be `free and equal.' The State may not restrict the vote to property owners either directly, through limitations on the right to vote, or indirectly, by giving a particular class the power to prevent an election.
103 Wash.2d at 673, 694 P.2d 641 (emphasis added).
By contrast, neither RCW 35.13.125.160 nor RCW 35A.14.120-.150 enables property owners to directly block an election. Instead, these statutes allow property owners to bypass the election procedure altogether. Thus, the constitutionality of the petition method as measured against the requirements of article I, section 19 depends on whether the statutes nevertheless interfere indirectly with the right to vote. We conclude that it does not. Merely because the Legislature has provided two alternative methods of achieving annexation, one of which involves voting, does not mean that the petition method implicates the right to vote. Therefore we hold that because the petition method does not directly or indirectly interfere with the right to vote, it does not violate article I, section 19.

Equal Protection Clause of the United States Constitution
Under the equal protection clause, a classification must treat similarly situated people equally. Cosro, Inc., v. Liquor Control Bd., 107 Wash.2d 754, 760, 733 P.2d 539 (1987). Respondents claim that people who do not own property are not, by definition, similarly situated to property owners. However, this court has previously held that landowners and other residents are similarly situated with respect to their interest in whether the land they own or live on is annexed into a city. In an annexation proceeding all residents have equal interests and are affected in fundamental ways: Annexation will affect governmental services and regulation as well as property tax levels. In addition, property taxes, through their indirect effects on rents and the costs of local services, affect residents who do not own property as well as those who do.
Seattle, 103 Wash.2d at 672, 694 P.2d 641.

Standard of Review
We must first determine the proper standard of review. Foley v. Dep't of Fisheries, 119 Wash.2d 783, 789, 837 P.2d 14 (1992). If the classification involves a suspect class or infringes on a fundamental right, strict scrutiny applies. Otherwise, the appropriate standard is rational basis review. Because no suspect class is involved in this case, strict scrutiny applies only if the classification infringes on a fundamental right. Seattle, 103 Wash.2d at 670-71, 694 P.2d 641.
The appellants first assert that the petition method of annexation infringes on residents' fundamental right to vote. Respondents argue that it does not infringe on the right to vote because it merely provides an alternative method of annexation.
The appellants argue that our reasoning in Seattle dictates that the statutes at issue here should be subject to strict scrutiny. In Seattle, this court examined whether RCW 35.13.165 was subject to strict scrutiny analysis under the equal protection clause. We held that it was because it effectively burdened the right to vote by granting property owners the power to prevent an election by filing a petition. Seattle, 103 Wash.2d at 670-72, 694 P.2d 641. However, in dicta, we noted that several other jurisdictions have found no infringement on the right to vote where the statutes "merely grant property owners the right to initiate the annexation procedure," distinguishing such cases from those in which voters made the final decision. *403 Seattle, 103 Wash.2d at 670, 694 P.2d 641 (citing Berry v. Bourne, 588 F.2d 422, 424 (4th Cir.1978)) (where challenged procedure does not involve or contemplate election, there is no unconstitutional limitation on right to vote); Doenges v. Salt Lake City, 614 P.2d 1237, 1239 (Utah 1980); Torres v. Vill. of Capitan, 92 N.M. 64, 582 P.2d 1277, 1283 (1978) (holding that petition method of annexation did not infringe on right to vote where none of state's annexation methods involved elections); Township of Jefferson v. City of West Carrollton, 517 F.Supp. 417, 420 (S.D.Ohio 1981), aff'd, 718 F.2d 1099 (S.D.Ohio 1983) (finding that statute which allows property owners to petition for annexation did not involve voting rights even though residents could vote on annexation under alternative statutory provision). See also Carlyn v. City of Akron, 726 F.2d 287, 289 (6th Cir.1984) (finding no infringement on voting rights where statute did not provide voters any final authority on annexation); Goodyear Farms v. City of Avondale, 148 Ariz. 216, 714 P.2d 386, 391-92 (1986) (holding that rational basis review was proper because Arizona petition method of annexation did not infringe on right to vote).
Similarly, in this case, the final decision on annexation rests not with the voters in an election but with the legislative body of the municipality. Thus, because the petition method of annexation does not burden the right to vote, this case is distinguishable from Seattle.
Appellants also rely on Hussey v. City of Portland, 64 F.3d 1260, 1262 (9th Cir.1995) in which the Ninth Circuit examined whether a Portland, Oregon ordinance, which required nonresidents to consent to annexation as a condition to receiving a subsidy for mandated sewer connections, violated the equal protection clause of the federal constitution. The court there disagreed with the reasoning of the above cases, holding that there is no substance to the difference between cases where votes lead directly to the result desired by the voters and those where a municipality makes the ultimate decision:
Contrary to the statements in Berry and Carlyn, traditional voting often has no direct, dispositive effect, but rather takes effect only when acted upon by others. For example, ... voter approval of a bond referendum does not compel a municipality to issue the bonds. If other financing is available, or interest rates move adversely, the government may decline to issue the bonds notwithstanding the voters' authorization. Yet the Supreme Court has explicitly held that municipal bond referendums do involve voting. Cipriano v. City of Houma, 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969).
Id. at 1264.
Hussey is inapposite. The statute at issue in Hussey involved a "double majority" annexation method that required the consent of a majority of both voters and landowners. Therefore, unlike the petition method at issue here, the ordinance at issue in Hussey directly implicated the voting process.[3] Because the petition method of annexation is an alternative to the election method, we conclude that it does not impede residents' fundamental right to vote under the federal constitution.
Second, appellants argue that petitioning is a fundamental right analogous to voting under the federal constitution. Respondents assert that the right to petition for annexation is not fundamental and that the method is rationally related to the Legislature's objective of giving all affected parties a voice in annexation.
At least one state has accepted the analogy between the right to petition for annexation and the right to petition for election. In Town of Fond du Lac v. City of Fond du Lac, 22 Wis.2d 533, 126 N.W.2d 201 (1964), the Wisconsin Supreme Court invalidated an annexation where signatures on the petition had been coerced by threats of eviction and offers of free rent. The court held that signing an annexation petition is a fundamental right "`analogous to voting upon the *404 question'" and that the use of economic pressure to obtain favorable signatures is "the equivalent of buying votes." Id. at 204 (quoting De Bauche v. City of Green Bay, 227 Wis. 148, 277 N.W. 147, 149 (1938)).
However, most states that have addressed the issue have rejected this analogy. See Adams v. City of Colorado Springs, 308 F.Supp. 1397 (D.Colo. 1970), aff'd, 399 U.S. 901, 90 S.Ct. 2197, 26 L.Ed.2d 555 (1970); Goodyear Farms, 714 P.2d at 390; Torres, 582 P.2d at 1282-83; Doenges, 614 P.2d at 1239. We agree with the approach adopted by the majority of courts and conclude that the right to petition for annexation is not a fundamental right under the federal constitution. Therefore, this case should be analyzed under rational basis review.

Analysis
Under rational basis review, a legislative classification will be upheld "unless it rests on grounds wholly irrelevant to the achievement of legitimate state objectives." State v. Thome, 129 Wash.2d 736, 771, 921 P.2d 514 (1996). A legislative classification is generally valid "if any state of facts reasonably can be conceived that would sustain it." United States R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 174, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) (quoting Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78-79, 31 S.Ct. 337, 55 L.Ed. 369 (1911)). Under rational basis review, legislative classifications are afforded extreme deference, and the court will often hypothesize a relationship. See, e.g., Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 487, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (hypothesizing a public health objective for the challenged law). In fact, under this standard, the United States Supreme Court has only struck down legislative classifications in 10 of the 110 cases in the past 25 years. Robert C. Farrell, Successful Rational Basis Claims in the Supreme Court From the 1971 Term Through Romer v. Evans, 32 IND. L.REV. 357 (1999).[4] The party challenging the classification has the burden of showing that it is purely arbitrary. Thorne, 129 Wash.2d at 771, 921 P.2d 514.
The Court of Appeals, Division One, has held that use of the petition method to annex property to a special purpose district (sewer district) did not violate the equal protection clause of the United States Constitution. Cunningham v. King County Boundary Review Bd., 6 Wash.App. 385, 493 P.2d 811, review denied, 80 Wash.2d 1007, appeal dismissed, 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972). However, this court has distinguished special purpose elections because they impact a special function only, unlike annexation to a city, which "affects general governmental authority" and is therefore of great importance to residents whether or not they own property. Seattle, 103 Wash.2d at 672-73, 694 P.2d 641 (relying on Salyer Land Co. v. Tulare Lake Basin Water Storage Dist., 410 U.S. 719, 728-29, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) (holding that elections for limited purpose districts will not receive same scrutiny as general city annexations)).
In the absence of Washington cases that are directly on point, the respondents ask us to turn to other jurisdictions. Amicus Washington Association of Municipal Attorneys cites at least 23 states that have codified petition methods for annexations.[5] However, not all states have methods that are analogous to the scheme adopted by Washington State. For example, Alabama Florida, Missouri, and North Carolina require signatures from 100 percent of the landowners. See, e.g., State ex rel. City of Birmingham v. City of Tarrant City, 294 Ala. 304, 315 So.2d 583 (1975) (indicating that method is available only where there is complete agreement about the annexation and no possibility of controversy). Other states such as Arkansas, Indiana, Nebraska, Virginia, and Wyoming require signatures from a majority of *405 owners of real estate, in addition to imposing requirements regarding a percentage of acreage or assessed value. Thus, these jurisdictions offer little guidance.
By providing for two methods of annexation, the Legislature has given both property owners and residents the opportunity to offer their input into the process. The petition method allows input from people who own land within the annexation area but who do not reside there, while the election method allows input from those who reside in the area but do not own property. This choice is rationally related to the objective of giving all affected parties a voice in the annexation process.
Furthermore, the distinction made within the classification between highly valued property owners and those with lower valued property does not violate the equal protection clause. The United States Supreme Court has upheld classifications that distinguish between two parties within the classification. Fritz, 449 U.S. at 177, 101 S.Ct. 453 (finding a rational basis for Congress's distinction between members of class of vested employees); City of New Orleans v. Dukes, 427 U.S. 297, 306, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (overruling Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957), which had struck down Illinois statute exempting American Express from certain restrictions placed on community currency exchanges as a violation of equal protection). In this case, the Legislature could have concluded that highly valued property owners had a greater interest in annexation than those with lower valued property. Therefore, the distinction is rationally related to the legislative purpose of facilitating the annexation process.
Because no fundamental right is implicated by the provision of an alternative to annexation by election, and because the petition method of annexation is rationally related to the Legislature's objectives, we hold that the petition method of annexation does not violate the equal protection clause of the United States Constitution.

Article I, Section 12 of the Washington State Constitution
Appellants finally assert that the petition method of annexation violates the privileges and immunities clause, article I, section 12 of the Washington State Constitution, by giving special privileges to certain property owners, and specifically those owning land with higher assessed values. Respondents assert that this court has not yet held that article I, section 12 gives broader protection than the equal protection clause of the United States Constitution. However, the United States Supreme Court has suggested that annexation is a suitable topic for state constitutional analysis, holding that the state at its pleasure may expand or contract the territorial area with or without the consent of the citizens, unrestrained by the United States Constitution, provided that it conforms to the state constitution. Hunter v. City of Pittsburgh, 207 U.S. 161, 178-79, 28 S.Ct. 40, 52 L.Ed. 151 (1907).
Although in recent cases we have held that the privileges and immunities clause is substantially similar to the equal protection clause, Seeley v. State, 132 Wash.2d 776, 788, 940 P.2d 604 (1997), we have also left open the possibility that article I, section 12 could provide greater protection than the federal equal protection clause. In re Det. of Turay, 139 Wash.2d 379, 412 n. 24, 986 P.2d 790 (1999). See also In re Pers. Restraint of Mota, 114 Wash.2d 465, 788 P.2d 538 (1990) (declining to address issue because parties provided insufficient arguments and briefing); Sofie v. Fibreboard Corp., 112 Wash.2d 636, 771 P.2d 711, 780 P.2d 260 (1989) (holding that interpretation of Const, art. I, § 12, if properly presented, could require a separate analysis). Because the parties here have properly briefed the issue, we will address whether Washington's privilege and immunities clause provides greater protection in this case than the equal protection clause.
Six nonexclusive neutral criteria must be considered when determining whether a state constitutional provision affords greater protection than the federal constitution: (1) the textual language of the state constitution; (2) significant differences in the *406 texts of parallel provisions of the federal and state constitutions; (3) state constitutional and common law history; (4) preexisting state law; (5) differences in structure between the federal and state constitutions; and (6) matters of particular state interest or local concern. State v. Gunwall, 106 Wash.2d 54, 58, 720 P.2d 808 (1986). The proper inquiry under Gunwall is "whether on a given subject the Washington constitutional provision affords greater protection than the minimum protection afforded by the federal constitutional analysis." Ford Motor Co. v. Barrett, 115 Wash.2d 556, 568, 800 P.2d 367 (1990).
Factors one and two of the Gunwall analysis focus on the textual language of the provision and the extent to which that language differs from that of the federal constitution. Gunwall, 106 Wash.2d at 61, 720 P.2d 808. The text of the clause in each constitution varies significantly. Const, art. I, § 12 provides:
No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.
U.S. Const, amend. XIV, § 1 provides, in pertinent part:
No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state ... deny to any person within its jurisdiction the equal protection of the laws.
The behavior proscribed by the federal constitution is to "deny to any person within its jurisdiction the equal protection of the laws," whereas the state constitution forbids granting "privileges or immunities which upon the same terms shall not equally belong to all citizens." Thus, whereas the federal constitution is concerned with majoritarian threats of invidious discrimination, the state constitution protects against laws serving private interests to the detriment of the majority.[6] Because of this difference in language, this court has previously held that "we should not foreclose the possibility that there may be a context where [the clause] should be independently examined." Gossett v. Farmers Ins. Co., 133 Wash.2d 954, 976, 948 P.2d 1264 (1997).
Further, this difference in emphasis suggests that under certain circumstances the state constitution gives greater protection.
Thus, one might expect that the state provision would have a harder "bite" where a small class is given a special benefit, with the burden spread among the majority. On the other hand, the Equal Protection Clause would bite harder where majority interests are advanced at the expense of minority interests.
Jonathan Thompson, The Washington Constitution's Prohibition on Special Privileges and Immunities: Real Bite for "Equal Protection" Review of Regulatory Legislation?, 69 TEMP. L.REV. 1247, 1251 (1996).
The third Gunwall factor instructs us to look at the constitutional history of the provision to determine whether the framers intended to confer greater protection than is offered by the federal constitution. Gunwall, 106 Wash.2d at 61, 720 P.2d 808. Article I, section 12 of the Washington State Constitution was adopted from article I, section 20 of Oregon's constitution. THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION, 1889, at 501 n. 20 (Beverly Paulik Rosenow ed., 1999). The Washington provision was changed only by adding a reference to corporations, which the framers perceived as manipulating the lawmaking process. Thompson, 69 Temp. L.Rev. at 1253. We may therefore look to interpretations *407 of the Oregon privileges and immunities clause for guidance. See State v. Smith, 117 Wash.2d 263, 287, 814 P.2d 652 (1991) (Utter, J., concurring). The Oregon court interprets its privileges and immunities clause independently, holding that the provision is triggered whenever a person is denied a privilege to which he would be entitled but for government interference. State v. Freeland, 295 Or. 367, 369-70, 667 P.2d 509 (1983).
Furthermore, the addition of the reference to corporations in our state constitution reflects concerns by the framers regarding undue political influence exercised by those with large concentrations of wealth, which they feared more than they feared oppression by the majority. Brian Snure, A Frequent Recurrence to Fundamental Principles: Individuals Rights, Free Government, and the Washington State Constitution, 67 WASH. L.REV. 669, 671-72 (1992); WILFRED AIREY, A HISTORY OF THE CONSTITUTION AND GOVERNMENT OF WASHINGTON TERRITORY 208 (1945);[7] Thompson, supra, 69 TEMP. L.REV. at 1253 (alteration to Oregon model "reflected the contemporary populist suspicion of the political influence accompanying large concentrations of wealth"). The concern to avoid favoritism toward the wealthy contrasts with the main objective of the equal protection clause, which was primarily concerned with preventing discrimination against former slaves. Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 81, 21 L.Ed. 394 (1872).
The difference in the history of the state and federal provisions was set out well by Justice Utter in a concurring opinion 10 years ago:
The Fourteenth Amendment was enacted after the Civil War and its purpose was to eliminate the effects of slavery. It was intended to guarantee that certain classes of people (blacks) were not denied the benefits bestowed on other classes (whites), thereby granting equal treatment to all persons. Enacted after the Fourteenth Amendment, state privileges and immunities clauses were intended to prevent people from seeking certain privileges or benefits to the disadvantage of others. The concern was prevention of favoritism and special treatment for a few, rather than prevention of discrimination against disfavored individuals or groups.
Smith, 117 Wash.2d at 283, 814 P.2d 652. Thus, the history as well as the language indicates that the Washington State provision gives greater protection where the issue concerns favoritism rather than discrimination.[8]
Factor four of Gunwall addresses preexisting state law, which "may be responsive to concerns of its citizens long before they are addressed by analogous constitutional claims." Gunwall, 106 Wash.2d at 62, 720 P.2d 808. This factor requires an analysis of the degree of protection that Washington State has historically afforded in similar situations. Gunwall, 106 Wash.2d at 61-62, 720 P.2d 808.
*408 The limitation on government grants of special privileges to certain individuals or groups was recognized prior to the adoption of the Washington Constitution in 1889. The Organic Act provided that "legislative assemblies of the several Territories shall not grant private charters or especial privileges." Organic Act, as amended, The Territories Act, 18 Stat. Title 23, ch. 1 § 1889, at 333 (1873-74) (2d ed. 1878). In Hays v. Territory of Wash., 2 Wash. Terr. 286, 288, 5 P. 927 (1884), the Washington Territorial Court upheld a statute that restricted hunting in five counties, against an attack under the Organic Act provision because the statute "[fell] without distinction upon all inhabitants of the Territory." Id.
Furthermore, in several early cases, this court interpreted article I, section 12 independently. See, e.g., N. Springs Water Co. v. City of Tacoma, 21 Wash. 517, 58 P. 773 (1899) (holding that franchise agreement between water utility and city council did not prevent city from building its own water works); In re Application of Camp, 38 Wash. 393, 80 P. 547 (1905) (invalidating ordinance that exempted farmers from ordinance forbidding anyone from peddling fruits and vegetables within city). In 1936, this court distinguished between the prohibition of "undue favor" (drawn from the state provision) and "hostile discrimination" (drawn from the fourteenth amendment):
The aim and purpose of the special privileges and immunities provision of Art. I, § 12, of the state constitution and of the equal protection clause of the fourteenth amendment of the Federal constitution is to secure equality of treatment of all persons, without undue favor on the one hand or hostile discrimination on the other.
State ex rel. Bacich v. Huse, 187 Wash. 75, 80, 59 P.2d 1101 (1936), overruled on other grounds by Puget Sound Gillnetters Ass'n v. Moos, 92 Wash.2d 939, 603 P.2d 819 (1979). See also Cotten v. Wilson, 27 Wash.2d 314, 178 P.2d 287 (1947) (adhering to distinction articulated in Huse in invalidating law that required plaintiff to prove gross rather than ordinary negligence against owner or operator of "victory motor vehicle"). Thus, preexisting state law favors a separate analysis of article I, section 12.
We have stated that our analysis in Gunwall indicates that factor fivethe structural differences between the state and federal constitutionswill always support an independent analysis. Gunwall, 106 Wash.2d at 62, 720 P.2d 808; Seeley, 132 Wash.2d at 790, 940 P.2d 604. See also Smith, 117 Wash.2d at 286, 814 P.2d 652 (listing several state constitutional protections not afforded citizens by federal constitution).
Finally, factor six favors independent analysis because annexations are a matter of state and local concern and therefore more appropriately addressed by the state constitution. See Hunter, 207 U.S. at 178-79, 28 S.Ct. 40 (finding annexation questions suitable for independent state constitutional analysis).
Therefore, we hold that the Gunwall factors weigh in favor of a determination that article I, section 12 of the Washington State Constitution provides greater protection than the equal protection clause of the United States Constitution when the threat is not of majoritarian tyranny but of a special benefit to a minority and when the issue concerns favoritism rather than discrimination.
We must now determine the appropriate standard of review under article I, section 12. Prior Washington cases have held that a legislative classification will not violate article I, section 12 if the legislation applies alike to all persons within a designated class and there is a reasonable ground for distinguishing between those who fall within the class and those who do not. United Parcel Serv., Inc. v. Dep't of Revenue, 102 Wash.2d 355, 367, 687 P.2d 186 (1984); Huse, 187 Wash, at 80, 84, 59 P.2d 1101. See also Sherman Clay & Co. v. Brown, 131 Wash. 679, 685, 231 P. 166 (1924) (Legislature may, without violating article I, section 12, regulate certain class of business if there is reasonable or just difference between those included in regulation and those excluded and the act applies alike to all persons subject to it); City of Spokane v. Macho, 51 Wash. 322, 324, 98 P. 755 (1909) ("[w]hen exercising its power to regulate a business, the municipality *409 may classify subjects of legislation, but the law must treat alike all of a class to which it applies, and must bring within its classification all who are similarly situated or under the same condition"); McDaniels v. J.J. Connelly Shoe Co., 30 Wash. 549, 555, 71 P. 37 (1902) (classification must be made upon some "reasonable and just difference between the persons affected and others").
However, the level of scrutiny applied when determining whether a "reasonable ground" exists in distinguishing between classifications has differed depending on the issues involved. For example, early Washington cases applying article I, section 12 to regulatory statutes that grant an economic benefit tend to require that the distinction rest on "real and substantial differences bearing a natural, reasonable, and just relation to the subject matter of the act." Huse, 187 Wash, at 84, 59 P.2d 1101.[9] In contrast, we have held that the "Legislature has broad discretion in making classifications for purposes of taxation." United Parcel Serv., 102 Wash.2d at 368, 687 P.2d 186. See also Camp, 38 Wash, at 397, 80 P. 547 (recognizing that classification may be valid under article I, section 12, "if the object of the legislation is revenue, and invalid if the object is regulation only"). Thus, we have stated that a revenue statute will not be invalidated under article I, section 12 if "any state of facts can reasonably be conceived that would sustain the classification." United Parcel Serv., 102 Wash.2d at 369, 687 P.2d 186.
Appellants assert that the right to petition is a fundamental right under the Washington Constitution, and as such, statutes involving petitioning should receive heightened scrutiny. Although we held that the right to petition was not fundamental under the federal constitution, we agree with appellants that it is fundamental under the Washington Constitution. Washington has long recognized the importance of the right of people to petition the government. See Cooper v. Hindley, 70 Wash. 331, 336, 126 P. 916 (1912) ("[n]o government has ever remained free unless the right of petition has been kept inviolate"). This is evidenced by article I, section 4 of the Washington Constitution, which protects "[t]he right of petition and of the people peaceably to assemble." See also State ex rel. Wells v. Dykeman, 70 Wash. 599, 602, 127 P. 218 (1912) (article I, section 4 guarantees people the right "to make such recommendations as they may conclude are for common good"). The people of Washington also reserved the right to petition both the Legislature and the populace generally through the initiative process in article II, section 1(a). See State ex rel. Brislawn v. Meath, 84 Wash. 302, 320, 147 P. 11 (1915) (in discussing importance of initiatives and referendums, court stated that "[t]he people have a right to adopt any system of government they see fit to adopt"); Save Our State Park v. Hordyk, 71 Wash.App. 84, 90, 856 P.2d 734 (1993) (right to initiative and referendum is "`sovereign rights of the citizen the right to speak ultimately and finally in matters of political concern'") (quoting State ex rel. Mullen v. Howell, 107 Wash. 167, 171, 181 P. 920 (1919)).
Appellants argue that the petition method of annexation violates article I, section 12 because it grants property owners, and more specifically, owners of highly valued property, a privilege that is not similarly granted to owners of lower valued property and nonproperty owning residents. The respondents assert the petition method of annexation is reasonably related to providing both nonproperty owning residents and nonresident *410 property owners a voice in the annexation process.[10]
When the Legislature first enacted laws regarding annexation, the right to petition for annexation was reserved to voters. Laws of 1890, ch. 7, at 227. The petition method was not added until 1945. Laws of 1945, ch. 128, at 327. Although there is no direct legislative history indicating why the petition method was adopted, other sources are illustrative. Annexation was a common practice during the late nineteenth century; however, municipal annexations declined in the first half of twentieth century. Council of State Gov'ts, THE STATES AND THE METROPOLITAN PROBLEM, at 27-28 (1956). By the 1940's and 50's, the "metropolitan" or "fringe" problem began to receive increased attention. Id. at 17-22. Annexation was widely viewed as the primary method of dealing with the metropolitan problem. Id. at 34. However, existing annexation laws were criticized as "unworkable" or "burdensome" because they often granted residents in the fringe areas the exclusive right to initiate the proceedings and/or the power to vote separately in the annexation. Id. at 34; ROBERT G. DIXON & JOHN R. KERSTETTER, TENTATIVE, PRELIMINARY, ABBREVIATED EDITION OF ADJUSTING MUNICIPAL BOUNDARIES: THE LAW AND PRACTICE IN 48 STATES, 35 (1959) (citing survey that found majority of cities and city leagues considered "veto power in area to be annexed, thru requirement of initiating petition or majority or extraordinary majority vote," a major limitation to annexation); FRANK S. SENGSTOCK, ANNEXATION: A SOLUTION TO THE METROPOLITAN AREA PROBLEM 16 (1960) ("criticism of self-determination may be justified for it is the greatest stumbling block to annexation today"). Thus, municipalities sought alternative methods of annexation, which granted them a greater ability to initiate annexation procedures and, at the same time, curtailed "excessive veto power" on the part of residents in the areas to be annexed. DIXON & KERSTETTER, supra, ADJUSTING MUNICIPAL BOUNDARIES at ix.
Washington was not immune to this national trend. In 1944, the Association of Washington Cities acknowledged the "need for better control of the areas adjacent to cities." Ass'n of Wash. Cities, Washington Municipal Bulletin No. 88, at 3 (Apr. 8, 1944) (compiled in Ass'n of Wash. Cities, Bureau of Gov't Research, Bulletins 55-93 (1940-45)). In its 1945 Legislative Program, the Association of Washington Cities proposed legislation that would simplify the annexation procedure by providing for a method of annexation "upon petition of owners of 75% of property contiguous to the city." Ass'n of Wash. Cities, 1945 Legislative Program of the Association of Washington Cities (1945) (compiled in Ass'n of Wash. Cities, Bureau of Gov't Research, Bulletins Series B-1-21 (1940-46)). Since its enactment, Washington cities have most frequently used the petition method of annexation because the election method has been found to be "extremely cumbersome." Mun. Research & Servs. Ctr. of Wash., ANNEXATION HANDBOOK FOR CITIES AND TOWNS IN WASHINGTON STATE at 54, 78 (Dec.1979); Mun. Research & Servs. Ctr. of Wash., Annexation Handbook 41, 59 (1995). Thus, although in theory both property owners and nonproperty owners have a voice in the annexation process, in reality, the petition method of annexation effectively grants property owners and, more specifically, owners of highly valued property, an almost exclusive voice in the annexation process. We therefore conclude that the petition method of annexation grants owners of highly valued property a privilege not equally afforded to owners of lower valued property and nonproperty owning residents.
We must next determine whether there is a "reasonable ground" for granting large *411 property owners this privilege. Although this court has previously held that "`[t]he power to enlarge the boundaries of a municipality by the annexation of contiguous territory is an incident to the legislative power to create and to abolish municipalities at pleasure,'" Wheeler School District No. 152 v. Hawley, 18 Wash.2d 37, 43, 137 P.2d 1010 (1943) (quoting 1 JOHN FORREST DILLON, MUNICIPAL CORPORATIONS §§ 355, 357, at 617 (5th ed.1911)), if the Legislature grants people the power to petition for annexation, it must do so on an equal basis to all other similarly situated parties. C.f, Seattle, 103 Wash.2d at 672, 694 P.2d 641 (holding that state has no compelling interest in granting property owners right to block election for annexation by petition). We have previously held that annexation will similarly affect all people who either live in or own property within the area to be annexed. Id. Therefore, because the petition method of annexation grants owners of highly valued property a privilege not afforded to other similarly situated parties, we hold that it violates article I, section 12.
Because we hold that the statute is unconstitutional, we need not reach the issue of whether the respondents complied with statutory requirements in the annexations.

CONCLUSION
The petition method of annexation offers privileges to a favored minority and is therefore unconstitutional as a violation of the privileges and immunities clause, article I, section 12 of the Washington State Constitution. We reverse the trial court and remand for further proceedings consistent with this opinion, including determination of costs and attorney fees.
ALEXANDER, C.J., SMITH, IRELAND, CHAMBERS and OWENS, JJ., concur.
MADSEN, J. (concurring/dissenting).
I agree with the majority's conclusions that the petition methods for seeking annexation at issue here do not violate article I, section 19 of the Washington State Constitution or the equal protection clause of the United States Constitution. I also agree that the state privileges and immunities provision provides a basis for an analysis independent of that of the equal protection clause. However, the majority's assessment under article I, section 12 of the constitutionality of the petition methods of annexation is insufficient, and provides little guidance for distinguishing those classifications that truly offend the constitution from those that do not. The predictable, and unfortunate, result is that courts will have license to make what are essentially ad hoc determinations of constitutionality under article I, section 12. In addition, I disagree with the majority's conclusion that the statutes at issue here violate the privileges and immunities clause. In contrast to the majority's limited consideration of the reasonableness of the classification that the Legislature has drawn, and its reliance on a case that does not support its analysis, there are in fact substantial reasons for permitting the owners of property, based upon the property's valuation, to initiate annexation proceedings. Accordingly, I dissent from the majority's holding that the petition methods are unconstitutional under article I, section 12.
The majority opinion is the first modern opinion to state that the privileges and immunities clause should be given a construction independent of that of the federal equal protection clause, although this court has alluded to the possibility of independent state analysis in several of its recent opinions. With this in mind, I believe it is essential that the court adhere to a principled analysis under article I, section 12, in order to delineate its protections in a meaningful and consistent manner. An important starting point is that a Gunwall analysis is intended to identify those situations where a state constitutional provision requires a separate and independent constitutional analysis. State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986). It does not follow, however, that when an independent analysis is employed, unconstitutionality will be found, and the majority does not make that assumption.
Historically, this court issued a number of opinions that illuminate the proper analysis under article I, section 12. As the majority correctly notes, the ultimate inquiry in this *412 case is whether the classification drawn by the Legislature, owners of the statutory percent valuation of the property within the area sought to be annexed, is, as variously stated in the cases, arbitrary or unreasonable, State v. Fraternal Knights & Ladies, 35 Wash. 338, 344, 77 P. 500 (1904), wholly arbitrary and capricious as opposed to predicated on a fair, just or natural basis, State ex rel. Bacich v. Huse, 187 Wash. 75, 81, 59 P.2d 1101 (1936), overruled on other grounds by Puget Sound Gillnetters Ass'n v. Moos, 92 Wash.2d 939, 603 P.2d 819 (1979), i.e., based upon some reasonable and just difference between those within the class and others, McDaniels v. J.J. Connelly Shoe Co., 30 Wash. 549, 555, 71 P. 37 (1902). "The distinctions giving rise to the classification must be germane to the purposes contemplated by the particular law and may not rest upon a mere fortuitous characteristic or quality of persons, or upon personal designation." Huse, 187 Wash, at 84, 59 P.2d 1101. The purpose of the law itself, of course, must be legitimate. See Ralph v. City of Wenatchee, 34 Wash.2d 638, 209 P.2d 270 (1949).
What I believe the majority has failed to effectuate, however, is the principle that "`[e]very presumption is in favor of the constitutionality of a legislative act, and ... in matters of classification, the legislature has a very broad discretion.'" Campbell v. State, 12 Wash.2d 459, 469, 122 P.2d 458 (1942) (quoting State v. Kitsap County Bank, 10 Wash.2d 520, 523, 117 P.2d 228 (1941)); see also Huse, 187 Wash, at 80, 59 P.2d 1101. In this regard, the majority has not sufficiently considered the particular nature of the laws at issue. As the majority recognizes, the type of law at issue may affect the constitutional analysis under article I, section 12. For example, legislative classifications where taxation statutes are concerned call for considerable judicial deference. Here, the particular statutes at issue involve municipal annexation. This is a matter particularly within the Legislature's power. As this court has recognized, "`[t]he power to enlarge the boundaries of a municipality by the annexation of contiguous territory is an incident to the legislative power to create and to abolish municipalities at pleasure.'" Wheeler Sch. Dist. No. 152 v. Hawley, 18 Wash.2d 37, 43, 137 P.2d 1010 (1943) (emphasis omitted) (quoting John Forrest Dillon, Municipal Corporations §§ 355, 357 at 617 (5th ed.1911)). Therefore, the court should be heedful of the due deference to be accorded the Legislature in this case. That deference must be given in substance, and not merely as a matter of a pro forma recitation. Otherwise, this court encroaches on the Legislature's authority and assumes for itself the power to determine what the law should be.
In addition to neglect of the deference due the Legislature, the majority also fails to properly assess the reasonableness of the legislatively drawn classification. Rather than determining whether the Legislature's classification of those who may petition for annexation is based on reasonable grounds, germane to a legitimate purpose of the law, the majority simply relies on the reasoning in City of Seattle v. State, 103 Wash.2d 663, 694 P.2d 641 (1985) that property owners and other residents of an area proposed to be annexed are similarly situated. City of Seattle does not answer the privileges and immunities question in this case, because it involved the constitutionality of a statute under an equal protection and right to vote analysis.
"Under the equal protection clause, persons similarly situated with respect to the purposes of [a] law must receive like treatment." Gossett v. Farmers Ins. Co., 133 Wash.2d 954, 979, 948 P.2d 1264 (1997) (quoting State v. Blilie, 132 Wash.2d 484, 493, 939 P.2d 691 (1997)). The court in City of Seattle was faced with an equal protection challenge to a statute that allowed property owners to block a vote on annexation under the election method. The court found that residents of an area proposed to be annexed were similarly situated to property owners with respect to the law because annexation would affect governmental services and regulation as well as property tax levels, and also property tax levels would indirectly affect rents and costs of local services. City of Seattle, 103 Wash.2d at 672, 694 P.2d 641. The court noted that settled law established that the state generally has no compelling interest in granting greater voting rights based on property ownership, and that the state had not *413 shown such an interest in this specific case. Id.
In contrast, in this case the petition methods do not concern the right to vote on an annexation, as the majority correctly concludes. Nor do they concern the final decision on annexation, unlike the election statute at issue in City of Seattle. Instead, if property owners of the proper percentage of assessed valuation in the area proposed to be annexed sign the annexation petition, the question of annexation goes to the city's legislative body for its final decision as to whether to annex. RCW 35.13.140; RCW 35A.14.130. The legislative body must hold a public hearing and invite interested persons to appear and voice approval or disapproval. RCW 35.13.140; RCW 35A.14.130. If, following the hearing, the legislative body decides to annex, it may annex all or any portion of the proposed area. RCW 35.13.150; RCW 35A.14.140.
Thus, the conclusion in City of Seattle that residents of the area proposed to be annexed are similarly situated to property owners for purposes of statutes affecting the right to vote on annexation under the election methods does not carry over to this case, where the challenged laws are completely different. Moreover, the question under the privileges and immunities clause is whether there is a reasonable ground for the classification. Finally, there is no settled law that granting greater rights to initiate consideration of annexation by property owners is unconstitutional, in contrast to the settled law in the voting rights cases. City of Seattle does not resolve the privileges and immunities issue in this case.
Rather than the majority's summary reliance on an inapplicable case, the privileges and immunities question should be resolved as follows. The challenged laws authorize initiation of annexation proceedings by owners of property in the area proposed to be annexed, but only where the petitioning owners own a specified percentage valuation of the property within the proposed area. As the majority explains, this method of annexation came about because annexation by elections often resulted in veto power on the part of residents in areas proposed to be annexed. At the same time, cities had a need to better control the fringe areas adjacent to them, particularly as their urban areas expanded. These efforts could be completely thwarted by residents voting to block annexation. In addition, the election method proved "cumbersome", and, it may be added, costly, since the expense of an election must be borne by the municipality.
The Legislature responded with statutes authorizing the petition method of annexation. These statutes plainly have legitimate purposes: to enable cities to annex contiguous land without cumbersome, costly elections, and to provide an alternative method of annexation that does not permit a "veto" by resident voters. In this regard, it must be remembered that a state may authorize annexation even over the wishes of the residents in the area to be annexed, provided it does so without violating constitutional principles. Hunter v. City of Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907).
The classification defined by the Legislature is also germane to the purposes of the law. The petition methods allow annexations without the need for elections and regardless of whether residents wish to "veto" the proposed annexation. The statutes thus allow for orderly municipal growth.
Finally, there are reasonable grounds for the classification that the Legislature has drawn. As to this inquiry, early cases indicate that the constitutional standard is not the same as the present equal protection "rational basis" test, where any conceivable legislative reason for a classification will suffice. Instead, the cases indicate a classification must rest on some real difference between those within and without the class that is relevant to the apparent or asserted purpose of the legislation. See Jonathan Thompson, The Washington Constitution's Prohibition on Special Privileges and Immunities: Real Bite for "Equal Protection" Review of Regulatory Legislation, 69 TEMP. L.REV. 1247, 1264-65 (1996). While residents and property owners have some similar interests affected by annexation, property owners have interests that are impacted to a much greater degree than residents who do not own property within the affected area.
*414 First, while it is true that all residents of the area proposed to be annexed are likely to be impacted at some point by property taxes assessed on land within the area, a property owner will always and immediately be affected by any increased taxed burden. In contrast, a tenant may have the option of moving from an area should rents reflect increased property taxes to a degree unacceptable to the tenant. Thus, the permanency of property taxes distinguishes property owners from other residents. See Goodyear Farms v. City of Avondale, 148 Ariz. 216, 222, 714 P.2d 386 (1986) (quoting Gorman v. City of Phoenix, 76 Ariz 35, 37, 258 P.2d 424 (1953)). And, should an owner opt to sell, property taxes will also be a factor in the sale.
In addition, the owners of property with higher value, either because of the quantity or intrinsic value of the property, will suffer these impacts to a greater degree. The amount or value of the land will mean a correspondingly greater share of property taxes. See Goodyear Farms, 148 Ariz, at 222, 714 P.2d 386 (citing and quoting Torres v. Vill. of Capitan, 92 N.M. 64, 70, 582 P.2d 1277 (1978)).
Further, property owners will be subject to the regulatory burdens resulting from annexation to a greater degree than nonproperty-owning residents. For example, property owners will be directly impacted by zoning and other land use regulations. Again, the applicable regulations will affect sales and price of land and other real property, should the landowner decide to end its status as a property owner within the area. While the impact of regulations may be reflected in uses and types of property and structures enjoyed by tenants, the impact will be most direct, and the greatest, on the landowner. And, reasonably, these impacts will be greater the more property is owned, or the higher the value of the property.
Moreover, the Legislature's classification based upon property ownership is a reasonable way to provide for an affirmative indication of interested parties' willingness for annexation to occur without requiring the approval of resident voters in the proposed area. Again, the Arizona court's observations are pertinent. That court noted, as does the majority, that a municipality is severely handicapped by the election method, and without an alternative method would be "unable to deal with the people living just outside the city, enjoying its advantages without having to pay for them. Such persons would seldom consent to annexation and their nonconsent could threaten the core city." Goodyear Farms, 148 Ariz, at 222, 714 P.2d 386 (citing Adams v. City of Colorado Springs, 308 F.Supp. 1397, 1404, (D.Colo.1970), aff'd per. mem. 399 U.S. 901, 90 S.Ct. 2197, 26 L.Ed.2d 555 (1970)).
Yet development at the periphery of a municipality owes its presence to the municipality in the first place, and a municipality's inability to annex that area and share in the growth it has generated "will weaken the city's ability to continue to provide a highlevel of services to the residents and exacerbate the problem of urban decay." Laurie Reynolds, Rethinking Municipal Annexation Powers, 24 Urb. Law. 247, 252 (1992). Annexation of the
fringe ... merely confirm[s] the reality that these developments are already a functional part of the city they surround. If the development is commercial or industrial, it undoubtedly depends heavily on city infrastructure. If the development is residential, its residents work, shop, entertain themselves, and use medical and other professional services in the city. The majority of those individuals will spend most of their day within the city limits, yet they will contribute nothing to the city's cost of providing infrastructure to the wide range of in-city activities of which they partake. Moreover, these nonresidents do not share in the cost of providing municipal services to the poor residents of the city, who live in high concentrations in urban areas. The cost is, however, imposed on city landowners.
Thus, nonresidents avoid paying their proportionate share of two significant city expenses: they neither contribute toward the maintenance of the city services and infrastructure they use on a daily basis, nor do they pay a share of the expenses the city assumes in providing municipal services to the city's poor. Annexation of *415 the fringe would distribute these costs more equitably.
Id. at 253-54 (footnotes omitted). By providing for the petition methods of annexation, the Legislature has provided a needed alternative to annexation that will avoid "veto" by vote of the area's residents, and allow for expanding growth to bear some of the cost of city services and provision of services for the poor. The Legislature reasonably keyed this alternative method of initiating annexation procedures to property ownership, and in particular, to those owners who collectively have more or more highly valued property. Those owners will be, in substantial part, subject to the permanent municipal property taxes that will pay for city services, including services for the poor.
Because of the greater effects on property owners, and especially on owners of a greater amount or of more highly valued property, and the need for an alternative method of annexation to the election methods, the Legislature's classification of property owners is based upon reasonable grounds.
Aside from the failure to accord the Legislature proper deference in its decision, and to engage in a thorough examination of the reasonableness of the classification drawn by the Legislature, the majority's conclusion that there is no basis for granting large property owners in particular the ability to commence annexation proceedings is puzzling. The majority draws a line separating owners of "highly valued" property from others. The statutes do not draw this distinctionthey refer only to owners of property of the necessary percentage valuation in total. In any annexation proceeding commenced by petition, the nature of the property owners' holdings will depend upon the area proposed to be annexed. If, for example, it is an area consisting of single-family residences of fairly equal value, there will be no distinction based upon large, or "highly valued" landholdings. The majority has defined a classification that the Legislature did not draw.[1]
In any event, as explained, there are valid reasons for requiring the owners of a certain percentage of property, based on valuation, to commence annexation proceedings.
Finally, there are other considerations to which the majority has given too little attention. The petition methods of annexation do not grant property owners the final say in whether the proposed area will be annexed. The final decision is in the hands of the municipality's legislative body. And, very importantly, that decision cannot be made until after there has been a public hearing to which interested parties must be invited and given the opportunity to voice approval or disapproval. Therefore, the residents of an area proposed to be annexed have the opportunity to influence the decision-making process regardless of whether property owners seek annexation. Thus, both property owners and residents have a say in the annexation decision, with the final decision to be made by the municipality's legislative body.
For the reasons stated, I concur in the majority's analysis under article I, section 19 of the state constitution and the equal protection clause of the federal constitution. I dissent, however, from the majority's analysis under article I, section 12 of the state constitution.
JOHNSON, J., concurs.
SANDERS, J. (dissenting).
Although I agree with the majority that the Washington Constitution's privileges and immunities section, article I, section 12, has a meaning separate and distinct from the equal protection clause of the Fourteenth Amendment to the United States Constitution, I do not agree that the unique right of a property owner to petition for annexation of his property into a municipality is either a "privilege" or "immunity" within the scope of the clause.
At the outset I note that the Fourteenth Amendment to the United States Constitution *416 references privileges and immunities and equal protection in separate and distinct phrases, thereby precluding the inference that each could possibly refer to the same thing. See 16 Am.Jur.2d Constitutional Law § 75, at 451-52 (1998) ("[W]here two parts of a constitution use different language to address... similar subject matter, a difference in meaning is presumed as a result of using the different language." (citing Harmelin v. Michigan, 501 U.S. 957, 978 n. 9, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991))).
Moreover the Slaughter House Cases, 83 U.S. (16 Wall) 36, 21 L.Ed. 394 (1872) distinguish between privileges and immunities of federal citizenship and those which `lay within the constitutional and legislative power of the States, and without that of the Federal government." Id. at 77. Such evidences the understanding that privileges and immunities are distinct from equal protection. Thus it would be something of a non sequitur to equate Washington privileges and immunities to federal equal protection.
It cannot be gainsaid that the terms "privileges" and "immunities" have an illustrious history in the annals of English-speaking people. The history of the terms, as well as their use in the Washington Constitution, is aptly traced by Barbara Mahoney in The Meaning of the Privileges or Immunities Clause In the Washington State Constitution (2001) (unpublished manuscript on file with author). The terms originate from two dominant sources of law in precolonial England: The Church and the State. Mahoney, supra, at 5. From there "the terms `privileges' and `immunities' were prominent features of the first colonial charters of the American colonies." Id. at 9. Use of the terms in colonial charters served to identify the rights of colonists with their contemporaries in England: In the context of their growing disputes with England, the colonists interpreted the Privileges and Immunities Clauses in their charters as a prohibition against every perceived difference in treatment from their fellow subjects in England. The most famous example occurred in 1765, when the Virginia assembly invoked the privileges and immunities provision of the Virginia Charter to protest the Stamp Act, declaring it an instance of taxation without representation in violation of the rights of English subjects.
Id. at 10. The use of the terms "privileges" and "immunities" continued in the Articles of Confederation, which guaranteed "all privileges and immunities of free citizens in the several states" to citizens of every state. Articles of Confederation and Perpetual Union, art. IV. Merrill Jensen, The Articles of Confederation 263 (1970).
A privileges and immunities clause was incorporated into article IV of the federal constitution and referenced in The Federalist No. 80. There Alexander Hamilton referred to the clause as "fundamental," stating it was "the basis of the Union." The Federalist No. 80 (Alexander Hamilton). See also Kimberly C. Shankman & Roger Pilon, Reviving the Privileges or Immunities Clause to Redress the Balance Among States, Individuals, and the Federal Government, 3 Tex. Rev. L. & Pol. 1, 8 (1998). The clause draws upon the natural rights and social compact theories underlying the Declaration of Independence. Bernard H. Siegan, The Supreme Court's Constitution 46-71 (1987) (stating clause guarantees Lochean conception of natural rights).
Justice Bushrod Washington's opinion in Corfield v. Coryell, 6 F. Cas. 546 (C.C.E.D.Pa.1823) (No. 3230) articulated our founders' understanding of the clause: We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may *417 justly prescribe for the general good of the whole. The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; ... and an exemption from higher taxes or impositions than are paid by the other citizens of the state; ... the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised. These, and many others which might be mentioned, are, strictly speaking, privileges and immunities,....
Id. at 551-52 (emphasis added). See also Saenz v. Roe, 526 U.S. 489, 521, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) (Thomas, J., dissenting). As to the relationship between equal protection of the laws and privileges and immunities, throughout the debates on the 14th Amendment the drafters referred to Equal Protection as one of the privileges and immunities. Derek Shaffer, Note, Answering Justice Thomas in Saenz: Granting the Privileges or Immunities Clause Full Citizenship Within the Fourteenth Amendment, 52 Stan. L.Rev. 709, 731-32 (2000).
Much more could be said about privileges and immunities. However, suffice for present purposes, article I, section 12, of our constitution by its plain language, requires no law grant "privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." The initial question must therefore be whether a law which grants property owners the right to petition for annexation is in fact a "privilege" or an "immunity" within the scope of the clause. It would appear from many of the authorities cited by the majority under the heading "Equal Protection" entitlements of this kind were never historically considered to implicate a "privilege" or "immunity."
An early discussion of the clause contained in United States Constitution article IV is provided by Campbell v. Morris, 3 H. & McH. 535, 1797 WL 430 (1797), rev'd, June 1800; see 3 H. & McH. at 576.[1] Referencing the generally understood meaning of the *418 clause prior to its incorporation into the Articles of Confederation, Judge Chase observed that one of its great objects "was the enabling the citizens of the several States to acquire and hold real property in any of the States." 3 H. & McH. at 553-54. He added, "[i]t is agreed it does not mean the right of election, the right of holding offices, the right of being elected." Id. at 554.
So too in Minor v. Happersett, 88 U.S. (21 Wall.) 162, 22 L.Ed. 627 (1874), which did not directly involve a question of the privileges and immunities of a citizen of a state, the Court discussed the question generally through Chief Justice Waite. There the question arose on behalf of the plaintiff, a woman, who claimed the provision of the Constitution of the State of Missouri restricting the right of suffrage to males denied her a privilege and immunity of a citizen of the United States. The Chief Justice observed that while women and minors were citizens by birth, the right of suffrage did not therefore attach as evidenced by the fact that there would be no reason for the Fifteenth Amendment if it did. "This case seems, therefore, sufficiently to settle that the right of suffrage is not one of the privileges and immunities incident to citizenship in a state [citing authorities]." W.J. Meyers, The Privileges and Immunities of Citizens in the Several States, 1 Mich. L.Rev. 286, 293 (1902).
If anything, a persuasive historical case might be made that the franchise could well be generally limited to real property owners consistent with the "Privileges and Immunities" available of right to all state citizens. Indeed, Jonathan Swift posits, "Law, in a free country, is, or ought to be, the determination of those who have property in land." Jonathan Swift, Thoughts on Various Subjects (1714), reprinted in The Quotable Lawyer 254 (David S. Shrager & Elizabeth Frost eds., 1986).
I am therefore hard-pressed to find authority or reason to conclude the landowner's prerogative with respect to annexation of his own property is a "privilege" rather than a natural consequence of his property ownership.
For these reasons I would affirm the respective trial courts.
NOTES
[1] Yakima County Clerk's Papers at 262.
[2] The BRB estimated the annual loss to YCFD12 at $28,465. YCFD12 conceded that this represented a minimal financial impact but expressed concern about the cumulative effect of multiple small annexations. Yakima has not yet sought transfer of any fire district assets to the city pursuant to RCW 35.02.200.
[3] Although the Oregon annexation statute at issue in Hussey only required the "consent" of a majority of landowners and a majority of registered voters in the territory to be annexed, the court held that the method was analogous to voting on annexation directly. Hussey, 64 F.3d at 1264.
[4] See also City of New Orleans v. Dukes, 427 U.S. 297, 306, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam) (stating that Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957) "was the only case in the last half century to invalidate a wholly economic regulation solely on equal protection grounds").
[5] Ala., Ark., Colo., Fla., Ill., Ind., Iowa, La., Minn., Mo., Mont., Neb., Nev., N.M., N.Y., N.C., N.D., Ohio, Or., S.C., Utah, Va., and Wyo.
[6] Because article I, section 12 was adopted from article I, section 20 of Oregon's constitution, Journal Of The Washington State Constitutional Convention, 1889, at 501 n. 20 (Beverly Paulik Rosenow ed., 1999), the Oregon Supreme Court's comments on the differences between the language of the two provisions are illustrative. See State v. Smith, 117 Wash.2d 263, 285, 814 P.2d 652 (1991) (Utter, J., concurring). The Oregon Supreme Court has stated: "`The provisions of the state Constitution are the antithesis of the fourteenth amendment in that they prevent the enlargement of the rights of some in discrimination against the rights of others, while the fourteenth amendment prevents the curtailment of rights.'" State v. Clark, 291 Or. 231, 236 n. 8, 630 P.2d 810 (1981) (quoting State v. Savage, 96 Or. 53, 59, 184 P. 567 (1919)).
[7] Unpublished Ph.D. thesis available at Washington State Library, Olympia, and University of Washington Library, Seattle.
[8] Early decisions of the Washington State Supreme Court that invalidated laws granting special advantages to certain people or classes of people also support our interpretation of article i, section 12's history. See State v. Robinson Co., 84 Wash. 246, 249-50, 146 P. 628 (1915) (invalidating statute that exempted cereal and flouring mills from act imposing onerous conditions on other similarly situated persons and corporations); In re Application of Camp, 38 Wash. 393, 80 P. 547 (1905) (holding that city ordinance prohibiting any one from peddling fruits and vegetables within city, but exempting farmers who grew produce themselves violated article i, section 12 as granting privilege to class of citizens); City of Spokane v. Macho, 51 Wash. 322, 98 P. 755 (1909) (holding Spokane ordinance regulating employment agencies unconstitutional because it imposed criminal penalties upon one party, but imposed no penalties for others in like circumstances); City of Seattle v. Dencker, 58 Wash. 501, 108 P. 1086 (1910) (invalidating Seattle ordinance as unconstitutional under article I, section 12 because it imposed tax upon sale of goods by automatic devices that was not imposed upon merchants selling same class of goods). However, if the law did not favor a particular person or class, it was upheld. See State v. Carey, 4 Wash. 424, 427, 30 P. 729 (1892) (refusing to invalidate statute which respondent argued granted physicians on state examining board immunity from general physician licensing requirements because there was no basis for concluding that board members were in fact exempt).
[9] See also Alton v. Phillips Co. v. State, 65 Wash.2d 199, 202, 396 P.2d 537 (1964) (holding that statute exempting one company from statute of limitations violated article I, section 12 because there was no reasonable basis denying exemption to all other similarly situated persons or corporations); Sherman Clay & Co., 131 Wash, at 682-83, 231 P. 166 (finding exemption for second-hand dealers of stoves, furniture, or contents of room or house to city ordinance requiring all other second-hand dealers to keep goods for 10 days before resale in violation of article I, section 12 as "abhorrent to the most primitive idea of fairness and equality"); State v. Sharpless, 31 Wash. 191, 197, 71 P. 737 (1903) (upholding statute that imposed different requirements on barbers depending on the district in which they carried on their business as reasonably related to statute's purpose of promoting health).
[10] Respondents also argue that the petition method of annexation "grants all citizens or corporations the right to petition for annexation equally on the same terms: ownership of property within the area proposed for annexation." Resp. Br. of Resp't/Cross-Appellant City of Yakima at 23. We previously held that annexation will similarly affect all people who either live in or own property within the area to be annexed, Seattle, 103 Wash.2d at 672, 694 P.2d 641. Because the petition method of annexation denies nonproperty owning residents a voice in the annexation, we reject respondent's contention that the petition method of annexation treats all citizens and corporations equally.
[1] The majority's "line drawing" is also analytically unworkable. In any group of property owners there may be wide variations in the amount of land owned and valuation of that land. At what point on the continuum is the line to be drawn? When does a property owner fall into the favored "high assessed evaluation" class, assuming that is, in the majority's view, the unconstitutionally favored class?
[1] Campbell was issued by one of two General Courts in Maryland. These courts, one on the eastern shore and one on the western, were courts of general jurisdiction, both civil and criminal, and heard appeals from county courts. While popular originally, the General Courts were abolished in 1805 after demands to promote accessibility and convenience. Their trial functions were replaced by the county courts, their appellate functions by the Court of Appeals, Maryland's high court. See State Agency Histories at the Maryland State Archives, General Court of the Western Shore, Doc. # SHI 10, available at http://www.mdarchives.state.md.us/; General Court of the Eastern Shore, Doc. # SH9, supra; Archives of Maryland Online, Court of Appeals, supra; James McSherry, "The Former Chief Judges of the Court of Appeals," from speech to the Bar, in Report of the Tenth Annual Meeting of the Maryland State Bar Association (1905), supra.

The Maryland Court of Appeals later reversed the judgment in Campbell without publishing any opinion. See Campbell, 3 H. & McH. at 576. This practice was then normal for the Court of Appeals. As one commentator explains, "During the early years of the Appellate Court's existence comparatively little business was before it. The people of the State were at that time more deeply concerned in filling the ranks of Maryland's regiments for service in the Continental Army, and with providing means to furnish her troops with muskets, ammunition and clothing, than they were interested in legal controversies." McSherry, supra.
Notwithstanding the reversal in judgment, it appears the General Court's published opinion has remained precedential for, among other points of law, its discussion of privileges and immunities. See Liggett & Meyers Tobacco Co. v. Goslin, 163 Md. 74, 160 A. 804, 808 (1932) (reasoning "that statement of the law has never been questioned"); Klotz v. Angle, 220 N.Y. 347, 358, 116 N.E. 24 (1917); People ex rel. Akin v. Loeffler, 175 111. 585, 609-10, 51 N.E. 785 (1898); Robinson v. Oceanic Steam Nav. Co., 112 N.Y. 315, 325, 19 N.E. 625 (1889); S.F. & N. Pac. R. Co. v. State Bd. of Equalization, 60 Cal. 12, 24, 1882 WL 1675 (1882); Van Valkenburg v. Brown, 43 Cal. 43, 49-50, 1872 WL 1120 (1872); People v. Williams, 24 Mich. 156, 1871 WL 3046, at *5 (1871); Ward v. Morris & Nicholson, 4 H. & McH. 330, 1799 WL 233 (1799); see also Saenz, 526 U.S. at 526, 119 S.Ct. 1518 (Thomas, J., dissenting) (citing Campbell with approval); Young v. Progressive Cos. Ins. Co., 108 Md.App. 233, 243, 671 A.2d 515 (1996) (same); Cole v. Randall Park Holding Co., 201 Md. 616, 625, 628, 95 A.2d 273 (1953) (same); Tedars v. Savannah River Veneer Co., 202 S.C. 363, 25 S.E.2d 235, 241 (1943) (same); see also Sawyer v. Morte, 21 F. Cas. 567, 567-68 (C.C.D.C.1828) (No. 12,401) (opining the judgment was reversed on grounds not relevant to privileges and immunities); Hopkins v. Stump, 2 H. & J. 301, 1808 WL 655, at *2 (1808) (same).