**The LUMMI NATION, et al., Plaintiffs,**

v.

**GOLDER ASSOCIATES, INC., et al., Defendants.**

**No. C01–1003L.**

United States District Court, W.D. Washington, At Seattle.

Dec. 2, 2002.

Harry L. Johnsen, III, Raas, Johnsen & Stuen, PS, Bellingham, WA, Judith K. Bush, Bellingham, WA, Michael E. Withey, Stritmatter Kessler Whelan Withey CAluccio, Seattle, WA, for Plaintiffs.

Michael J. Bond, Gardner Bond Trabolsi McDonald & Clement, Seattle, WA, David A. Dial, Paul L. Weisbecker, Atlanta, GA, for Defendants.

Mark Oliver Brevard, Attorney General's Office Agriculture & Health, Olympia, for Amicus.

### ORDER REGARDING CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

LASNIK, District Judge.

This matter comes before the Court on plaintiffs' "Motion for Partial Summary Judgment." Plaintiffs seek a declaration

that defendants breached their contractual obligations to the Lummi and that defendants' removal of human remains from the Semiahmoo site in February, July, and August 1999 entitles plaintiffs and/or the State of Washington to an award of damages under the Indian Graves and Records Act, RCW 27.44 *et seq.*, ("IGRA"). Defendants filed a response and cross-motion for a summary determination that they had not breached any contractual obligations or violated IGRA. In the alternative, defendants argue that IGRA is unconstitutional and that all of plaintiffs' claims should be dismissed for failure to join indispensable parties.

## UNDISPUTED FACTS

In the mid-1990's the City of Blaine decided to upgrade and expand its wastewater treatment plant on the Semiahmoo Spit in Whatcom County. The land on which the wastewater treatment plant is located was the site of a winter village of the Semiahmoo band. When the treatment plant was originally constructed in the 1970's, numerous human burials were found at the site. Recognizing this fact, the City of Blaine retained Larson Anthropological/Archaeological Services ("LAAS") to conduct a cultural resource assessment of the proposed expansion site, including the identification of traditional cultural areas. Decl. of Gordon Tucker (filed 8/12/02), Ex. A. LAAS concluded that intact cultural deposits, including human remains, were probably located in various portions of the site.

As the City moved forward with is excavation and construction plans, the Washington State Historic Preservation Officer ("SHPO") required that a plan be developed for handling any human remains that might be uncovered at the site. Decl. of Gordon Tucker (filed 8/12/02), Ex. F at 1. The City retained defendant Golder Associates, Inc. ("Golder") to further assess the cultural resources at the site, to consult with the Lummi and other affected parties, to prepare a treatment plan designed to mitigate any adverse effects caused by the construction activities, and to proceed with controlled archaeological excavations at the site. Decl. of Gordon Tucker (filed 8/12/02), Ex. B, Attachment A. Golder and Rural Development ("RD"), the federal program that supplied loans and grants to the expansion project, initiated consultation with the Lummi in mid-1998. The Lummi representatives made the following points:

● The City's excavation and construction plans should be flexible enough to allow changes in the project if and when intact archaeological deposits were found. The Lummi wanted Golder to focus on the in situ preservation of archaeological finds rather than salvage operations. Second Decl. of Michael Withey (filed 9/13/02), Ex. B.

● The tribe's primary goal was to maintain the integrity of human burials at the site. Second Decl. of Michael Withey (filed 9/13/02), Ex. B.

● Fragmentary or disturbed human remains hold the same amount of significance for the Lummi as do complete or intact remains. Decl. of Michael Withey (filed 4/11/02), Ex. M.

When Golder proposed a treatment plan for the site in November 1998, it specifically noted these concerns. Decl. of Michael Withey (filed 4/11/02), Ex. E at 38–39. The treatment plan also stated that there "are some Lummi people who are trained to work with human remains and they should be consulted with regard to the handling of any burials or fragmentary remains located on the site." Decl. of Michael Withey (filed 4/11/02), Ex. E at 39. For reasons that are not entirely clear from the record, the Lummi never submitted a list of their concerns in writing, did not participate in the drafting of the treat-

ment plan, and never formally concurred in the November 1998 plan proposed by Golder. Decl. of Gordon Tucker (filed 8/12/02), Ex. F.

In January 1999, RD and SHPO entered into a Memorandum of Agreement regarding the City of Blaine's wastewater treatment expansion project. RD agreed to ensure that the project was implemented in conformance with a revised version of the November 1998 treatment plan. Decl. of Michael Withey (filed 4/11/02), Ex. H at 662–63. RD also agreed that if any Native American burials or human remains were discovered during construction, it would notify the Lummi and "consult with them over the treatment of remains." Decl. of Michael Withey (filed 4/11/02), Ex. H at 664. In light of the difficulties Golder and RD had encountered in getting timely responses from the Lummi when drafting the treatment plan, the January 1999 version of the plan limited the Lummi's role in certain respects in an apparent attempt to avoid potential delays. Nevertheless, the treatment plan acknowledged that:

> The Lummi have expressed concern that more human remains may be found within the [site]. The City appreciates the sanctity and importance of these remains to the Lummi people, who recognize a cultural relationship with the site's pre-contact inhabitants, and will treat the remains with the utmost dignity and respect.

Decl. of Michael Withey (filed 4/11/02), Ex. I at 36. In order to address the concerns of the Lummi, the treatment plan provided that the construction activities would be "monitored by a professional archaeologist." Decl. of Michael Withey (filed 4/11/02), Ex. I at 29. If and when human remains of any sort were found, RD, the Lummi, SHPO, and the City would be notified immediately. Decl. of Michael Withey (filed 4/11/02), Ex. I at 29 and 38. All work in the vicinity of the find would

cease and the remains would be "exhumed from the ground and transported to a secure City facility" where they would be held until their final disposition was determined in consultation with the Lummi. Decl. of Michael Withey (filed 4/11/02), Ex. I at 30, 38, and 39. All human remains were to "be handled with the utmost respect and sensitivity." Decl. of Michael Withey (filed 4/11/02), Ex. I at 30.

Although the Lummi were invited to sign off on the January 1999 treatment plan, they had not done so as of January 8, 1999, when RD decided to move forward under the plan. Decl. of Gordon Tucker (filed 8/12/02), Ex. F. RD did, however, assure the Lummi that it would continue to notify the tribe regarding discoveries at the site and encouraged them "to be on site during excavations and actively participate when notifications are made by archaeologists." Decl. of Gordon Tucker (filed 8/12/02), Ex. F at 1. In early February 1999, Golder proceeded with controlled archaeological excavations designed to investigate certain areas where artifacts were thought to be located and to further assess the nature and extent of the historical deposits at the site. Defendant Gordon Tucker led Golder's archaeological team. On February 8, 1999, human remains were uncovered at the site. Tucker called Theresa Pouley, a tribal attorney, and reported the find. Decl. of Michael Withey (filed 4/11/02), Ex. D at 56. Tucker agreed to take the human remains to the Lummi reservation, which he did on February 9, 1999. While at the reservation, Tucker met with Pouley and Al Scott Johnnie, the Lummi Cultural Director, to establish a protocol for handling human remains. As summarized in his field notes, the key points of the discussion were as follows:

> (1) designation of reinternment [sic] site. Best would be the area immediately east of plant, in "undisturbed" location. Next best would be next to fence

on east side of enclosure. Third best might be in NW corner. Al will have to look at these locations. The guiding principle is that remains should be re-buried as close as possible to original location. FIND OUT OWNERSHIP OF EAST PROPERTY!

(2) Fragmentary remains in fill we will simply collect and document and give to Lummi. Other remains in situ, complete or otherwise, we will notify Al Scott Johnnie and he will come to inspect and take away remains.

(3) This practice ↑ can be followed during monitoring, but we need to lay it out formally, in consultation with Lummi, City, RD, SHPO, _____. ARCHAEO-LOGICAL MONITORING PLAN

(4) Signed up 2 tribal members to work at site: Lonny James and Isaac Lawrence. They will join us tomorrow.

(5) Send (FAX) Theresa Pouley a daily report on findings, especially if ancestral remains are found.

(6) Turned all bones (FS1–15) to date to Al Scott Johnnie.

Will send Theresa Pouley a daily progress report detailing where we work and what we found.

Decl. of Michael Withey (filed 4/11/02), Ex. D at 58–59.

Starting on February 10, 1999, Tucker faxed Pouley a daily progress report per their oral agreement. Additional human remains were uncovered at the site on February 12, 1999. Although they were not identified on the progress report for that day, a summary of the events of February 12–15 was faxed to Pouley on February 16, 1999, and included reference to the recovery of a "partial maxilla (jaw bone) of juvenile human, unassociated with any other human remains." Decl. of Gordon Tucker (filed 8/12/02), Ex. G at 2108.

Noone from the tribe came to inspect or retrieve the human remains uncovered on February 12 and it was apparently shipped to Golder's offices in Canada for further evaluation.[1]

Golder's contract with the City required them to "prepare a preliminary report that briefly describes the results of controlled excavations and initial interpretations." Decl. of Gordon Tucker (filed 8/12/02), Ex. B at 2. Interestingly enough, the results of the February archaeological excavations did not seem to matter in the long run: by contract, Golder was obligated to "recommend that construction be allowed to proceed, this construction to be monitored by a professional archaeologist." Decl. of Gordon Tucker (filed 8/12/02), Ex. B at 2. Following completion of the assessment described in their original contract, Golder and the City expanded the scope of work through a contractual amendment. As of June 28, 1999, Golder agreed to monitor the upcoming construction activities at the site "in compliance with the Memorandum of Agreement and treatment plan" signed in January. Decl. of Gordon Tucker (filed 8/12/02), Ex. B, Amendment # 1.

Excavation geared toward construction, rather than archaeological assessment, began in early July 1999. As a general matter, Golder archaeologists, led by Tucker, placed themselves near the excavation equipment so that they could see whether the machines were turning up historical artifacts and/or human remains. No tribal members participated in this phase of the project. When objects of interest were uncovered, the archaeologists stopped the excavation in that area and, once the opening was deemed safe, climbed into the hole to record and remove the deposits. During these recovery oper-

---

1. The Field Specimen Log attached as Exhibit N to the Decl. of Michael Withey (filed 4/11/02) indicates that a fibula, which may or may not have been human, was found at the site on February 16, 1999. The Lummi were not notified of that find.

ations, excavation continued in other areas of the site, but the machines were not allowed back into the area where the artifacts had been discovered until the archaeologist gave his or her approval. The human remains were then placed in bags or boxes and stored in a shed at the site.

Soon after the construction phase began, human remains were found. One of the archaeologists began exhuming the remains while the other archaeologist continued to monitor the work that continued elsewhere. Tucker called Pouley, the tribal attorney, on or shortly after the July 7 discovery. The content of the voice mail message he left is hotly disputed, but the Court will assume, for purposes of this motion, that Tucker reported that Golder had found human remains at the site. Tucker did not fax Pouley a progress report or attempt to notify RD or SHPO about the find. The Lummi did not send anyone to observe the excavation or retrieve the remains found on July 7. Work at the site continued and turned up numerous additional human remains, some of which were intact and some of which were fragmentary. The discoveries spanned almost a month, appear to have comprised at least 28 separate burials, and are detailed in the field notes attached as Exhibits Q and S to the Decl. of Michael Withey (filed 4/11/02). At no point after he left a phone message for Pouley regarding the July 7 discovery did Tucker attempt to get in touch with the Lummi, RD, or SHPO.

On August 2, 1999, another Golder archaeologist came to the site to replace Tucker. Tucker packed up all of the human remains that had been discovered to date, placed them in the back of his pickup truck, and drove to Golder's Colorado offices. The next day, Al Scott Johnnie, the Lummi Cultural Director, stopped by the site to observe the construction activities. A Golder archaeologist was, at that time, in the process of exhuming another skeleton. Johnnie conferred with the archaeologist long enough to ascertain that this was not the first human burial that had been discovered and removed without Lummi input. Johnnie contacted RD and SHPO, who subsequently halted the construction.[2]

## PROCEDURAL ISSUES

■ Defendants rightly object to Mr. Withey's attempt to testify to facts and matters that are clearly outside his personal knowledge and/or that constitute legal opinions. Paragraphs 2 through 12 of the Decl. of Michael Withey (filed 4/11/02) are hereby STRICKEN. The Court has, however, considered the exhibits attached to counsel's declaration.

■ Plaintiffs' objections to certain statements contained in defendants' response are overruled. Defendants' arguments regarding who had the burden to notify the Lummi of discoveries at the site, whether the Lummi failed to consult, and what Tucker did when remains were found on July 7, 1999, are based on the evidence presented. The fact that plaintiffs draw contrary conclusions or object to defendants' interpretation of the evidence does not make the arguments of counsel improper or inadmissible.

■ Defendants argue that plaintiffs' claims must be dismissed under Fed. R.Civ.P. 19 because RD and SHPO are both necessary and indispensable in the context of this litigation. The Court disagrees. Whether defendants breached their contractual obligations and/or violated IGRA can be determined based on their

2. Although not relevant to the issues currently before the Court, the story continues with Pouley and another tribal official flying to Colorado and retrieving the Semiahmoo remains from the back of Tucker's pickup on August 6, 1999.

own promises and actions, regardless of the contractual obligations and potential liability of RD and/or SHPO. A finding for or against plaintiffs would not prejudice the absent parties' interests or leave defendants at risk of multiple or inconsistent obligations. RD and SHPO are not, therefore, necessary parties to this litigation.

## LEGAL ANALYSIS

### I. BREACH OF CONTRACT CLAIM

Prior to June 28, 1999, Golder had promised to do nothing more than conduct a cultural assessment of the site through (a) consultation with the Lummi, (b) preparation of a treatment plan, and (c) limited archaeological investigation. Although the process through which the consultation occurred was apparently unsatisfactory to both the Lummi and Golder, the consultation did take place and the Lummi concerns were generally identified and incorporated into the January 1999 Memorandum of Agreement and treatment plan. Defendants' actions and conduct in February 1999 did not breach any provision to which Golder had agreed.

On or about June 28, 1999, however, Golder promised to monitor the construction activities at the site in compliance with the requirements of the January 1999 Memorandum of Agreement and treatment plan. This they did not do. As the "professional archaeologist" referenced in Section 5.3 of the treatment plan, Golder was responsible for contacting RD, the Lummi, SHPO, and the City if human remains were discovered at the site. Decl. of Michael Withey (filed 4/11/02), Ex. I at 29. Defendants argue that it was RD that had the obligation to contact the Lummi pursuant to the Memorandum of Agreement (Decl. of Michael Withey (filed 4/11/02), Ex. H at 664) and that Golder never agreed to notify anyone regarding their findings at the site. Defendants read the contracts too narrowly and urge a construction which is not reasonable. Although Golder wrote sections 5.3 and 5.6.3 using the passive voice, it is clear from the context of the agreement, the identity of the author, and the language used in the contract that the archaeologist, who was required to be on site and who had the ability to identify human remains, was responsible for giving notice to all of the other interested parties, including both RD and the Lummi. Decl. of Michael Withey (filed 4/11/02), Ex. I at 29 and 38. Through operation of Amendment # 1, Golder agreed to be the "professional archaeologist" mentioned in the treatment plan. Even if the Court assumes that RD had a separate contractual obligation to contact the Lummi when human remains were discovered, such an obligation does not absolve defendants of their contractual duties. In addition, there would be no way for RD to contact the Lummi about finds at the site unless and until Golder notified RD of such discoveries. As discussed above, Golder failed to notify anyone about the human remains uncovered on July 8, 12, 20, 26–29, and August 2. The only attempt defendants made to notify the Lummi about the discovery made on July 7 consisted of a phone message: no attempt was made to notify RD or SHPO of the finds.

Defendants also argue that Tucker's phone call to Pouley on or shortly after July 7, 1999, satisfied whatever obligations defendants may have had under their contract with the City. The only reasonable interpretation of the treatment plan, however, is that the provisions regarding cessation of work, party notification, and removal and storage of recovered remains applied to each and every discovery of human remains. The one-notification-fits-all scheme urged by defendants in this litigation makes no sense where all parties were aware that the Lummi were concerned about each bone, whether part of

an intact burial or a mere fragment, the contract anticipated the serial discovery of remains and made no provision for a single notice, defendants had previously followed a practice of issuing daily progress reports detailing any relevant finds, and the discovery of numerous intact burial sites would, in all likelihood, be an important factor to SHPO, RD, and the Lummi in determining their course of action. Most importantly, however, the language of the agreement in Sections 5.3 and 5.6 allows for no other interpretation than that the notification is to follow closely upon the discovery of human remains: there is no indication that the notification requirement or post-discovery procedures are to be altered for the second, third, or twenty-third discovery, and defendants cannot add such terms at this point.

The treatment plan with which Golder agreed to comply also required that any exhumed remains be "transported to a secure City facility and held there until their final destination is determined." Decl. of Michael Withey (filed 4/11/02), Ex. I at 30. Tucker's removal of the human remains from the Semiahmoo site to Colorado violated this provision and constitutes a separate breach of defendants' agreement with the City of Blaine.

■■■ Having found that defendants breached their contract in two respects, the Court must determine whether plaintiffs are third-party beneficiaries of the agreement. The issue is whether the parties intended, at the outset of the contract, that Golder assume a direct obligation to the Lummi. *Burke & Thomas, Inc. v. International Org. of Masters, Mates & Pilots*, 92 Wash.2d 762, 767, 600 P.2d 1282 (1979). "To determine if a third-party beneficiary exists the court should consider the terms of contract and determine if performance of the contract necessarily and directly benefits a third party." *Lewis v. Boehm*, 89 Wash.App. 103, 106, 947

P.2d 1265 (1997). Defendants argue that their agreement to monitor the construction activities in compliance with the January 1999 Memorandum of Agreement and treatment plan was designed to further the expansion of the wastewater treatment plan and that "any benefit running to the Lummi was incidental to the construction effort . . . ." Response at 13. The contracts with which defendants agreed to comply recognized that the Lummi had a cultural, historical, and familial interest in any human remains at the site and provided that they would be notified of any discoveries in a timely manner. Contrary to defendants' argument, these provisions do not further the City's construction activities: rather, the required notification and cessation of work in the area would simply hinder the project. These requirements were imposed for the purpose of protecting archaeological artifacts that were of interest to the Lummi and to give the tribe an opportunity to participate in their recovery and ultimate disposition. It is clear from the facts that the Lummi were third-party beneficiaries to Golder's amended contract with the City.

## II. INDIAN GRAVES AND RECORDS ACT, RCW 27.44, *et seq.*

### A. Standing

■■ Defendants argue that IGRA provides a cause of action only to those tribal members who can establish a next of kin or biological relationship with the remains found at the Semiahmoo site. For all of the reasons stated in the Court's "Order Granting in Part Plaintiffs' Motion for Class Certification," the Court finds that the Lummi Nation and its members have standing to bring suit under RCW 27.44, *et seq.* IGRA itself does not require a particular degree of biological relationship. While it is possible, as discussed below, that the state and federal equal protection

clauses mandate that the Act be interpreted to require some historical, familial, or cultural relationship between the Lummi and the remains at the Semiahmoo Site, such ties exist here. Defendants do not dispute that the twenty-first century Lummi Tribe includes descendants of the nineteenth century Semiahmoo band. The Lummi are a recognized successor of at least a portion of the Semiahmoo band: the fact that there may be other tribes who could also bring a cause of action under IGRA as the successors of the Semiahmoo does not invalidate the Lummi claim. In fact, the language of the statute recognizes that more than one tribe may have an interest in a particular set of remains. *See* RCW 27.44.020.

## B. Statutory Scheme

Although the parties like to emphasize particular portions of the statute, they both recognize that IGRA must be read and interpreted as a unified whole. In 1989, the legislature acknowledged that existing protections for tribal burial grounds had not stopped the ransacking of Indian graves for profit-making purposes or overcome the careless disregard some individuals had shown when such graves were accidentally disturbed through construction or other non-archaeological activities. RCW 27.44.030. In an apparent desire to add teeth to existing prohibitions, the legislature declared it a felony to "knowingly remove[ ], mutilate[ ], deface[ ], injure[ ], or destroy[ ] any cairn or grave of any native Indian." RCW 27.44.040(1). The inadvertent disturbance of a tribal grave gives rise to an obligation to reinter the human remains under the supervision of the appropriate tribe (RCW 27.44.040(1)), unless reasonable efforts were taken to preserve the remains and "the accidental discovery or disturbance was properly reported" (RCW 27.44.040(4)).

The legislature did not, however, want to deter the legitimate scientific study of archaeological finds or arbitrarily prevent construction where the property owner takes adequate preservation measures. It therefore left unchanged RCW 27.44.020. If a person who falls within the literal reach of the criminal provisions of RCW 27.44.040 claims that his or her activities were part of an archaeological investigation, as is the case here, the provisions of RCW 27.44.020 apply. Pursuant to that section, an archaeologist may remove material from a grave if (1) the material is "destined for reburial or perpetual preservation in a duly recognized archaeological repository" and (2) "permission for scientific research and removal of specimens of such records and material has been granted by the state historic preservation officer." IGRA, by its terms, gives control over archaeological investigations and the disposition of artifacts to SHPO: anyone who wants to remove materials from a tribal burial ground must get permission from the state. SHPO, in turn, must notify the affected tribe (in this case, the Lummi), but SHPO has the option of permitting an archaeological dig regardless of the stance taken by the affected tribe as long as the artifacts are destined for reburial or perpetual preservation. The statutory scheme enables the state to balance the sometimes competing interests of land owners, tribes, and scientists and to make an informed judgment on how best to accommodate their varying needs in a particular situation.

■ Defendants argue that the criminal provisions of IGRA were never meant to cover situations where a professional archaeologist is attempting to preserve artifacts that would otherwise be ground to dust during construction activities. The Court disagrees for at least two reasons. First, the parties recognized in their contract that IGRA was applicable to the type of activities at issue here, and defendants

implicitly agreed that they were bound by its requirements. Second, IGRA contains explicit provisions that cover archaeological studies. RCW 27.44.020 requires an archaeologist to obtain SHPO's permission for any removals. The fact that a prosecutor might choose not to charge a person in Mr. Tucker's position with a felony offense under RCW 27.44.040 is not determinative. The civil penalty provision (RCW 27.44.050) is triggered by acts "alleged to have violated" the criminal provision: neither charging nor conviction under RCW 27.44.040 is a prerequisite to a civil suit.

 In the alternative, defendants argue that SHPO gave his permission for the removals at issue here by consenting to the Memorandum of Agreement and the attached treatment plan. Defendants apparently believe that once SHPO signed the Agreement, they had permission to do anything they wanted at, and remove anything they found from, the site. They are wrong. SHPO's approval of the construction project and the related archaeological investigation and removals was contingent on the parties' compliance with the terms of the treatment plan. As discussed above, SHPO approved a scheme by which human remains would be removed from the excavation area only after notification to the Lummi, SHPO, RD, and the City. Once the remains were removed from the ground, they were to be stored in a secure City facility until their final disposition had been determined through consultation with the Lummi. Golder disregarded the limitations placed on their activities and, with one possible exception, exhumed remains without notifying SHPO, RD, or the Lummi and carted them off to Colorado. Contrary to defendants' arguments, SHPO did not authorize or give permission for the removals that took place in July and August 1999. Defendants have failed to show that their conduct falls within the exception to liability afforded by RCW 27.44.020.

 With regard to the February 1999 removals, the Lummi apparently did have notice of each discovery of human remains, either through the progress reports that were faxed to Pouley or through the two tribal members who participated in the excavation process. In addition, there is an issue of fact regarding whether or not the Lummi approved the subsequent transfer of human remains to Canada for further analysis. The Court cannot, based on this record, determine whether defendants' February 1999 conduct violated IGRA.

 Finally, plaintiffs argue that defendants are responsible for the improper removal of human remains to the Tapley and Freeman properties. Plaintiffs have not alleged, however, that defendants controlled any of the equipment which disturbed the archaeological deposits, that they were involved in the transportation of soils to the off-site locations, or that they knowingly allowed human remains to slip through their screening mechanisms. At most, plaintiffs can argue that defendants should have known, either from the nature of the site or the nature of the deposits that were uncovered during construction, that human remains were, in fact, in the excavated materials that were taken to the Tapley and Freeman properties by other contractors hired by the City. IGRA does not, however, contain any provision for the imposition of liability on an individual who simply fails to stop a third-party from removing items from a tribal burial site. The Court rejects the concept of accomplice liability (as argued by plaintiffs) on these facts. Defendants are therefore entitled to summary judgment on the IGRA claim regarding the City's inadvertent shipment of human remains to the Tapley and Freeman properties.

## C. Constitutionality

### 1. Privileges and Immunities / Equal Protection

Defendants argue that the legislature's grant of a civil cause of action to tribes and tribal members violates the privileges and immunities clause of the Washington State Constitution and the equal protection clause of the United States Constitution because other racial or ethnic groups are not permitted to sue for the desecration of historic graves, whether tribal or non-tribal. Because the state and federal constitutions vary significantly on this issue, the factors considered in *State v. Gunwall,* 106 Wash.2d 54, 720 P.2d 808 (1986), "weigh in favor of a determination that article I, section 12 of the Washington State Constitution provides greater protection than the equal protection clause of the United States Constitution when the threat is not of majoritarian tyranny but of a special benefit to a minority and when the issue concerns favoritism rather than discrimination." *Grant County Fire Protection Dist. No. 5 v. City of Moses Lake,* 145 Wash.2d 702, 731, 42 P.3d 394 (2002). Such is the case here.

▮▮▮▮ A legislative classification does not violate article I, section 12 if the legislation applies alike to all persons within a designated class and there is a reasonable ground for distinguishing between those who fall within the class and those who do not. *Grant County,* 145 Wash.2d at 731, 42 P.3d 394. In this case, all tribes and tribal members are treated alike, satisfying the first prong of the analysis. The issue, then, is whether there are reasonable grounds on which to distinguish tribes and tribal members on one hand from all other citizens of the State of Washington with regards to the benefit granted by the legislature. The Court finds that the classification is reasonable in light of the purposes for which IGRA was enacted. The statute is designed to curb grave robbing and the careless indifference which too often deprived the citizenry of archaeological information and the assurance that the dead will rest in peace. The Act permits tribes or tribal members who had a familial, cultural, historic, or successor relationship with the remains[3] to act as private attorneys general to enforce the prohibitions. Such individuals or groups have a closer relationship with the remains than do other citizens of the State of Washington, are more likely to be injured by the disturbance of tribal burial grounds, and are more likely to take upon themselves the task of enforcing IGRA than would those who fall outside the challenged classification. Defendants' privileges and immunities and equal protection challenges fail.

---

**3.** While the language of the statute is very broad and could conceivably give a cause of action to any Native American tribe or individual in the country, such an expansive reading would raise constitutional issues insofar as the Iroquois would have no more relationship to or interest in remains found at the Semiahmoo site than would any citizen of Washington, arguably making such distinctions unnatural, unreasonable, and without any just relation to the subject of the Act. *See State v. Huse,* 187 Wash. 75, 84, 59 P.2d 1101 (1936), *overruled on other grounds, Puget Sound Gillnetters Assoc. v. Moos,* 92 Wash.2d 939, 603 P.2d 819 (1979). In such circumstances, the Court may adopt a reasonable construction of the statute which avoids the constitutional question and potential infirmity. *Ma v. Ashcroft,* 257 F.3d 1095, 1106 (9th Cir.2001) (citing *DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) and *United States v. Jin Fuey Moy,* 241 U.S. 394, 401, 36 S.Ct. 658, 60 L.Ed. 1061 (1916)). The Court will, therefore, interpret the statute to include a requirement that the tribe or tribal members seeking to protect ancient burials have some familial, cultural, historic, or successor relationship with the remains.

## 2. Establishment of Religion

■ Defendants argue that RCW 27.44.050 violates the proscriptions against the establishment of religion found in article I, section 11 of the Washington State Constitution and the First Amendment to the United States Constitution. Contrary to defendants' arguments, IGRA's purpose and effect are primarily secular. The preservation of historic graves, whether tribal or not, is of legitimate interest to the state for a number of historical, cultural, and a-religious reasons. The legislature's use of the word "spiritual" does not necessarily mean "religious." In this context, the term encompasses cultural and ancestral ties to human remains which arise from common lineage and/or a shared history, rather than from any religious teaching. Defendants have offered no reason to suppose that an atheist would be devoid of a feeling of spiritual closeness with or attachment to an ancestor's remains simply because he does not believe in a supreme being. Even if the legislature enacted IGRA based in part on its recognition that certain religions hold ancestral remains in high esteem, such an acknowledgment does not alter the secular preservationist purpose, establish a state religion, or unduly entangle the state in religion. *See, e.g., Lynch v. Donnelly,* 465 U.S. 668, 673, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (government has a duty to affirmatively accommodate, not just tolerate, all religions, and the Constitution "forbids hostility toward any"); *Malyon v. Pierce County,* 131 Wash.2d 779, 800, 935 P.2d 1272 (1997) (fact that citizens may ask a public servant to pray with them does not change the state's secular purpose of providing counselors at times of crisis to a religious one).

Defendants' main argument is that, because some or all of the emotional distress caused by their actions arises from plaintiffs' individual religious beliefs, any attempt by the state to make plaintiffs whole is a constitutional violation. Stripped of its constitutional trappings, defendants are arguing that citizens have the right to adversely impact another's religious practices with impunity because any attempt to punish the temple vandal, service trespasser, or tomb robber impermissibly places the might of the state on the side of religion. Such absolution for all crimes against and injuries to religious persons or places is not required under the state or federal constitutions. Defendants offer no case law in support of their analysis and, where the obvious purpose of the legislation and its primary effect are secular, defendants cannot escape the consequences of their actions merely because the sensibilities injured are sectarian in nature.

## 3. Impermissible Gift of Public Revenues

■ Defendants also argue that RCW 27.44.050 impermissibly gifts state funds to the Lummi for the benefit of their private interests, in violation of article VIII, section 5 of the Washington State Constitution. As discussed above, IGRA creates a scheme by which the state retains control over the artifacts and remains while at the same time considering and balancing the interests of various groups. Contrary to defendants' assertion, IGRA does not call for any public property to be "given away," although it is within SHPO's discretion to allow the tribe to designate the method and place of reinterment.

To the extent defendants are arguing that permitting plaintiffs to file a civil suit for damages is a grant of public property, they have not explained how allowing individuals to sue for their emotional distress, none of which was suffered or recoverable by the State, depletes or otherwise comes at the expense of the public weal. Rather, the State benefits by plaintiffs' active par-

ticipation in this matter insofar as it avoids the costs of enforcing IGRA and may, in fact, obtain an award of punitive damages to the State treasury.

For all of the foregoing reasons, plaintiffs are entitled to summary judgment on their claim that defendants breached their contractual obligations and IGRA by (1) failing to notify the Lummi of the discovery of human remains on July 8, 12, 20, 26–29, and August 2 1999, and (2) transporting human remains from the Semiahmoo site to Colorado on August 2, 1999. Defendants are entitled to a summary determination that a third party's transport of soils which contained human remains to the Tapley and Freeman properties did not constitute a breach of contract or violation of IGRA.